**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital | Misc. Action 1:26-mc-00007-MSM-AEM |

**GOVERNMENT'S RESPONSE IN OPPOSITION**

Less than a week ago, but over ten months after the issuance of the subpoena in question, a judge in the Northern District of Texas—the district where this criminal investigation is being conducted—ordered Rhode Island Hospital to comply with the subpoena. Rather than intervene in that existing case to seek reconsideration or review of that order, Rhode Island's Child Advocate (Child Advocate or Plaintiff) asks this Court to quash the subpoena or, in the alternative, order Rhode Island Hospital not to comply. But this Court lacks the authority to set aside the Northern District's order, and the Child Advocate lacks Article III standing to seek that relief. The Child Advocate's problems do not end there. The Child Advocate also lacks standing under the relevant statutory scheme, and her action is untimely. Beyond that, the Child Advocate's challenges to the subpoena itself are both misguided and meritless. This Court should deny the motion and dismiss the case.[1]

**BACKGROUND**

On July 3, 2026, the Government issued a subpoena pursuant to its 18 U.S.C. § 3486 subpoena authority to Rhode Island Hospital. Doc. 1-2. The subpoena's return date was August 7, 2025. Doc. 1-2 at 1. The Hospital chose not to move to quash the subpoena, and in fact

---

[1]  These arguments are made in the alternative to the Government's motion to transfer filed today. Doc. 8. As a threshold issue, a stay or transfer is necessary under the "first-to-file" rule.

engaged with the Government and led the Government to believe that it would comply with the subpoena. However, the Hospital never complied and never moved to quash.

On April 30, 2026—nearly ten months after the Hospital was served with the subpoena, and nearly nine months after a motion to quash was due under the statute, *see* 18 U.S.C. § 3486(a)(5)—the Government moved to enforce the subpoena in the jurisdiction where this nationwide investigation is being carried on, which is the Northern District of Texas. 18 U.S.C. § 3486(c). That same day, the district court signed an order enforcing the subpoena. *In the Matter of Administrative Subpoena 25-1431-032* (N.D. Tex. 2026 Apr. 30, 2026) (Doc. 2 at 1). On May 4, 2026, the Child Advocate for the State of Rhode Island filed this motion in response, asking this Court to either quash the subpoena or, in the alternative, to order Rhode Island Hospital not to comply. Doc. 1 (Mot.).

## **ARGUMENT**

There are three main reasons why Plaintiff's request for emergency relief must be denied: *First*, under Article III and the collateral attack doctrine, this Court cannot invalidate or modify the recent order of its sister court in Texas or enjoin a nonparty to this case from complying with that order—the only relief that would actually provide redress for Plaintiff. *Second*, Plaintiff—who is apparently litigating on behalf of a small, undefined group of people—lacks statutory, prudential, or Article III standing to bring an untimely motion to quash the entirety of a subpoena that is ten months old and has already been enforced. *Third*, the subpoena is procedurally and substantively proper.

I.  **This Court Lacks Subject-Matter Jurisdiction to Enter the Relief Plaintiff Requests**

    a.  **Plaintiff Lacks Article III Standing**

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "[S]tanding is an essential and unchanging part of [this] case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. For Hippocratic Med.,* 602 U.S. at 380. The Child Advocate's case fails on redressability.

To satisfy the redressability requirement, a plaintiff must show that "a favorable resolution of her claim would likely redress the professed injury." *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012).[2] Whether a plaintiff has met her burden requires consideration of both the requested relief, *see Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996) (explaining that the redressability inquiry is simply "whether, if plaintiffs secured the relief they sought, it would redress their injury"), and the power of the court to issue it, *see M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief."). When, for either reason, a plaintiff's requested relief will "not remedy the

---

[2]    The focus in this inquiry is the likely effect of the Court's judgment rather than the likely effect of the Court's opinion. *See Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power. … It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.")

injury suffered," a plaintiff lacks standing and a federal court lacks jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Plaintiff requests two remedies. The primary request is quashal of the entire subpoena. Mot. at 45. Alternatively, Plaintiff requests an order directing Rhode Island Hospital "not to comply with the Subpoena, or at a minimum not to provide any information regarding names, dates of birth, Social Security numbers, addresses, parent/guardian information, diagnoses, clinical assessments, consent forms, billing records linked to identified patients, or other personal health information." *Id.*

Neither remedy meets Article III's demand of redressability because neither remedy will redress Plaintiff's alleged injuries. Last week, the Northern District of Texas issued an order directing Rhode Island Hospital to "provide all records responsive to each request in the subpoena within 14 days." Doc. 2 at 1, *In the Matter of Administrative Subpoena 25-1431-032* (N.D. Tex. Apr. 30, 2026). Regardless of whether this Court quashes the subpoena or enters an injunction aimed at Rhode Island Hospital, this order compelling Rhode Island Hospital to comply with the subpoena will remain (unless stayed by the district judge in the Northern District of Texas or the Fifth Circuit Court of Appeals). Indeed, it is black letter law that, absent transfer, reassignment, or the like, one district court judge is powerless to amend an order of another district court judge. *See In re McBryde*, 117 F.3d 208, 225 (5th Cir. 1997) ("[T]he structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction." (quotation omitted)); *Prosser v. Shappert*, No. 23-2072, 2025 WL 215518, at *2 (3d Cir. Jan. 16, 2025) ("Plaintiffs cannot use one district court judge to overrule an order of a different district court judge.").

4

And this is especially true here, when Plaintiff explicitly and transparently seeks to end-run an order entered in the first-filed case. *See* Resp. Mot. to Transfer, Doc. 8. To seek relief from an order of the Northern District of Texas, Plaintiff can litigate there. The remedies requested here will not, and indeed cannot, have the same effect. Either way, the Northern District of Texas' order still exists, and Rhode Island Hospital will remain under obligation to produce all its records responsive to the subpoena.

The requested injunction faces another problem too. "[A] court may not enter an injunction against a person who has not been made a party to the case before it." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996); *see, e.g.*, *Scott v. Donald*, 165 U.S. 107, 117 (1897) (finding a decree "objectionable because it enjoins persons not parties to the suit"); *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980) ("A court cannot lawfully enjoin the world at large … its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." (cleaned up)); Fed. R. Civ. P. 65(d)(2) (listing "persons bound" by injunction). The Child Advocate's request for an injunction aimed at Rhode Island Hospital—a non-party—transgresses this basic limit on a federal court's equitable powers. Redressability is therefore lacking.

### b. Even if This Court Had Subject-Matter Jurisdiction, the Collateral Attack Doctrine Would Bar the Relief Plaintiff Requests

For many of these same reasons, this Court cannot order relief under the collateral attack doctrine. "A 'collateral attack' is a tactic whereby a party seeks to circumvent an earlier ruling of one court by filing a subsequent action in another court." *Pratt v. Ventas, Inc.*, 365 F.3d 514, 519 (6th Cir. 2004). "Federal court orders are to be respected unless and until they are reversed either by the issuing court itself or a higher court," *Verogna v. Johnstone*, 583 F. Supp.3d 331, 336–37 (D.N.H. 2022) (collecting cases on collateral attack doctrine and citing *Celotex Corp. v.*

*Edwards*, 514 U.S. 300, 313 (1995)), because "[d]isagreements with rulings in a suit are matters for appeal, not collateral litigation," *id*. "The collateral attack doctrine directs that challenges to the orders, decisions, or judgments of a court other than through these well-recognized procedures are generally improper, and to allow such collateral attacks would seriously undercut the orderly process of law." *Stafne v. Zilly*, 337 F. Supp. 3d 1079, 1084 (W.D. Wash. 2018).

Here, Plaintiff is explicit about the goal of collaterally attacking the order entered in the Northern District of Texas last week. Indeed, the only reason this action exists, and the only reason this is an "emergency" motion, is because Plaintiff wants this Court to take action to prevent the order in Texas from taking effect. Doc. 1 at 2. Hence, the analysis under the collateral attack doctrine is simple: this action's sole purpose is to "circumvent an earlier ruling" of another federal district court, and the collateral attack doctrine precludes the relief Plaintiff seeks. *Verogna*, 583 F. Supp.3d at 336–37. The collateral attack doctrine, however, does not leave Plaintiff without a remedy; Plaintiff may pursue intervention, reconsideration, appeal, and/or mandamus in the Northern District of Texas and/or the United States Court of Appeals for the Fifth Circuit. But an appeal of an order of the Northern District of Texas lies in the Fifth Circuit, not the District of Rhode Island. 28 U.S.C. § 1291.

## II.    Plaintiff Lacks Statutory Standing to Pursue This Untimely Action

### a.  The Child Advocate lacks standing to challenge the subpoena under the controlling statute.

Plaintiff has another threshold problem that on its own requires denial of her motion. Congress specifically limited who may challenge a HIPAA subpoena issued under Section 3486. The statute provides precise direction: "At any time ***before the return date*** specified in the summons, ***the person or entity summoned*** may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting

6

aside the summons[.]" 18 U.S.C. § 3486(a)(5) (emphasis added). Here, the "entity summoned" is Rhode Island Hospital. Plaintiff—and the minors upon whose behalf she claims to be litigating—are not the subpoenaed entity. They therefore fall outside the statute's express grant of authority to sue, and the motion should therefore be denied summarily.

That patients are not included among those authorized to contest subpoenas for their medical records is the product of intentional legislative design, not omission. In other statutes authorizing investigative demands, Congress has expressly granted notice and standing to third parties whose records are sought. For example, the Right to Financial Privacy Act ("RFPA") requires notice to a customer whose financial records are sought and expressly provides that such customers may challenge a subpoena calling for disclosure of their records. *See* 12 U.S.C. § 3410; *see also* 18 U.S.C. § 2704(b) (expressly authorizing customer/subscriber challenges as part of Stored Communications Act); *cf.* 47 U.S.C. § 551(h) (providing that governmental entity can obtain personally identifiable information from cable television service providers through court order only after cable subscriber has opportunity to appear and contest claim); 18 U.S.C. § 2704(b) (Electronic Communications Privacy Act providing that a "subscriber or customer may file a motion to quash such subpoena"); 26 U.S.C. § 7609(b) (permitting taxpayer who is under investigation to move to quash or intervene in proceedings regarding enforcement of subpoena).

This point is not academic, courts have given it concrete effect. For example, a court properly held under RFPA that *only* "customers" have standing to challenge a subpoena—corporations and other third-parties falling outside the statute's definition of "customer" do not. *See Mackey v. SEC*, No. 3:96MC407, 1997 WL 114801, at *1–2 (D. Conn. Feb. 21, 1997). As *Mackey* demonstrates, when Congress delineates who may contest a subpoena, it necessarily forecloses challenges by others—those not included are excluded. *See Esteras v. United States*, 606 U.S. 185, 195 (2025) (applying *expressio unius est exclusio alterius*, the "well-established

7

canon of statutory interpretation" that provides "expressing one item of [an] associated group or series excludes another left unmentioned" (alteration in the original) (quotation omitted)). Here, § 3486 allows only "the person or entity summoned" to challenge a HIPAA subpoena.[3]

This construction is confirmed by other aspects of the statute, including that Section 3486 imposes no notice requirement on the Government or the entity summoned to inform patients or other individuals whose records might be implicated. This structure is distinct from other administrative subpoena statutes. *See* 12 U.S.C. § 3405(2) (RFOA, requiring service of "a copy of the subpoena or summons … upon the customer"); 18 U.S.C. § 2704(a)(2) (Electronic Communications Privacy Act, requiring "[n]otice to the subscriber or customer … within three days"); 26 U.S.C. § 7609(a) (IRS subpoena statute, requiring "notice" and "a copy of the summons" to be timely served on "any person (other than the person summoned) who is identified in the summons"); 47 U.S.C. § 551(h) (requiring that cable subscriber have "the opportunity to appear and contest" the disclosure).

Not only does the HIPAA subpoena statute omit such a requirement to tell patients when their records are being disclosed to the Government, but the statute affirmatively permits courts to *forbid* a subpoena recipient from "disclos[ing] to any other person or entity" the "existence" of the subpoena. 18 U.S.C. § 3486(a)(6)(A). When a judge orders nondisclosure of the existence of a HIPAA subpoena, non-recipients will, by definition, have no opportunity to learn of and challenge the subpoena. Moreover, Section 3486 preempts Rhode Island's state law that requires a notification of the patient whose records are sought, making it even less likely that non-

---

[3] It would be no answer if Plaintiff were to argue that the Administrative Procedure Act generally permits challenges to agency actions. Plaintiff has not invoked the APA in this action. And agency- or action-specific statutes commonly limit the availability of APA review by imposing additional requirements, like limiting who can file challenges, what actions can be challenged, where challenges can be filed, imposing exhaustion requirements, and the like. The APA expressly yields to such limitations. *See* 5 U.S.C. § 702.

recipients will learn of the subpoena in time to challenge it. 18 U.S.C. § 3486(d) (preempting liability under "any Federal, State, or local law" for "compli[ance] in good faith" with a subpoena in "any court of any State or the United States … for the nondisclosure of" production of documents); *see* R.I. GEN. LAWS §§ 5-37.3-6.1, 5-37.3-9.

In enacting HIPAA, Congress spoke directly to patient privacy interests and expressly required the Government to adopt rules and regulations to protect those interests. For instance, in Section 264 of HIPAA (codified as a note to 42 U.S.C. § 1320d-2), Congress directed the Secretary of HHS to develop recommendations for protecting the privacy of "individually identifiable health information," and if Congress failed to act, to promulgate regulations on its own. Pub. L. No. 104-191, § 264 (1996). Congress also deliberately chose to channel enforcement of those patient privacy protections through regulations and administrative oversight, not private suits by patients. *See Borges v. Rhode Island Dep't of Child. Youth & Fams.*, No. 1:25-CV-00124-MSM, 2025 WL 2918351, at *2 (D.R.I. Oct. 14, 2025) (dismissing private HIPAA claim because HIPAA does not create "private right of enforcement") (McElroy, J.). Congress enacted these privacy provisions at the same time as it created the subpoena authority of Section 3486. The legislative choice to address patient privacy in one HIPAA provision while simultaneously excluding patients from any role in challenging Section 3486 subpoenas confirms that Congress deliberately deprived them of standing to challenge a HIPAA subpoena unless they themselves are the "person or entity summoned."

That choice makes sense. HIPAA subpoenas are investigative tools that are specifically designed to obtain patient and billing records so that the Government can gather evidence to determine whether (or not) a federal offense relating to the healthcare products or services a patient received has been committed. It is not uncommon for a federal healthcare offense investigation to require the collection of tens of thousands of patient records for review and

analysis. *See, e.g., In re Subpoena Duces Tecum*, 228 F.3d 341, 350–51 (4th Cir. 2000) (upholding HIPAA subpoena to physician for patient records and noting that if physician treated 15,000 patients, suspicion of fraud would justify reviewing all 15,000 patient records). If every patient mentioned in responsive records could move to quash a HIPAA subpoena, the statute's enforcement scheme would collapse under the weight of collateral third-party litigation. That is not the careful scheme that Congress designed, which expressly and exclusively requires HIPAA subpoena challenges to be brought by "the person or entity summoned." 18 U.S.C. § 3486(a)(5).

Perhaps recognizing that she lacks standing under the relevant statute to bring this action, Plaintiff elevates her claim to one of constitutional significance—asserting that that the subpoena to Rhode Island Hospital unconstitutionally intrudes on the "informational privacy" of the minors in DCYF custody. But the Supreme Court has repeatedly refused to unequivocally endorse a constitutional right to "informational privacy" and has instead only assumed its existence arguendo while *upholding* the government's access to personal information. *See NASA v. Nelson*, 562 U.S. 134, 138, 147 (2011) (citing *Whalen v. Roe*, 429 U.S. 589, 599 (1977)); *see also id.* at 160 (Scalia, J., concurring) ("A federal constitutional right to 'informational privacy' does not exist."). The circuits remain split on the question. *Compare Dillard v. O'Kelley*, 961 F.3d 1048, 1054 (8th Cir. 2020) (en banc) ("the alleged constitutional right to informational privacy is not 'beyond debate' in the Eighth Circuit."); *Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786, 791 (D.C. Cir. 1997) (expressing "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information"); *Lee v. City of Columbus*, 636 F.3d 245, 260–61 (6th Cir. 2011) (stating that individuals have only a limited privacy interest in medical records and disclosure of such information does not rise to level of constitutional violation) *with Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021) (finding constitutional privacy right exists but that prisoner did not have reasonable expectation of privacy in his HIV status). Even the leading First

Circuit Court of Appeals case on informational privacy, *Borucki v. Ryan*, 827 F.2d 836 (1st Cir. 1987), stops short of holding that a constitutional right to privacy in medical records exists. Under Plaintiff's framing, anyone whose name appeared in a medical record could halt a federal health care investigation in its tracks by invoking an amorphous privacy interest. This is not right.

### b.  Plaintiff's motion is time barred.

Even if Plaintiff had standing under the statute, her motion would still be barred as untimely under the statute. Section 3486 requires any petition to quash or modify a HIPAA subpoena to be filed "before the return date specified in the summons." 18 U.S.C. § 3486(a)(5). Courts strictly enforce statutory deadlines to move to quash a subpoena—and failure to bring a timely challenge is jurisdictional. *See Ponsford v. United States*, 771 F.2d 1305, 1309 (9th Cir. 1985) (strictly construing statute's 20-day limit to bring proceeding to quash IRS summons; holding statutory deadline is jurisdictional and "is a condition precedent to the waiver of sovereign immunity"); *see also Starks v. Dep't of Defense*, No. 2:26-MC-00075-DJC-CSK (PS), 2026 WL 1018996, at \*3 (E.D. Cal. Apr. 15, 2026) ("Movant's untimely filing of the motion [to quash administrative subpoena] renders it procedurally and jurisdictionally deficient, constituting sufficient grounds to deny the motion with prejudice."); *Swann v. Secretary, HUD*, No. 05-492, 2006 WL 148738, at \*1 (D.D.C. Jan. 19, 2006) (court lacks subject matter jurisdiction where motion challenging administrative subpoena is untimely under statute authorizing challenge); *Turner v. United States*, 881 F. Supp. 449, 450 (D. Haw. 1995) ("the jurisdiction granted district courts [over a motion to quash an administrative subpoena] by [the Internal Revenue Code] is limited by the twenty-day filing requirement of [the statute].").

Here, Plaintiff brought this action on May 4, 2026—270 days after the return date specified on the subpoena: August 7, 2025. As a result, Plaintiff cannot invoke the statute's limited mechanism to challenge the subpoena, even assuming Plaintiff could otherwise satisfy

the statute's standing requirement. Again, this scheme makes sense. Congress coupled the subpoena authority in Section 3486 with a firm deadline: any motion to quash must be filed before the return date. That bright line was no accident. To excuse the motion's nine months of tardiness would convert a clear statutory command into an open invitation for endless obstruction—paralyzing large-scale healthcare offense investigations by patient challenges brought at will. That is not the law.

### III.     The Subpoena Is Valid and Enforceable

Turning to the merits, Plaintiff argues that the subpoena is unenforceable, principally because it is supposedly motivated by an improper purpose. That argument fails. The subpoena readily satisfies all the requirements for enforceability, and Plaintiff's "improper purpose" argument depends on a failure to understand that the Executive Branch can both have, express, and pursue policy goals and enforce existing federal laws. Expressing policy opposition to a particular practice or industry does not immunize that industry from compliance with existing federal law. And it is unsurprising that the Executive Branch would seek to enforce patient protection laws like the Food, Drug, and Cosmetic Act in an industry in which it has concerns about patient safety—concerns that the Supreme Court has recognized at minimum have "a rational basis." *United States v. Skrmetti*, 605 U.S. 495, 523 (2025).

#### a.   The Subpoena Satisfies the Essential Prerequisites for a Valid Administrative Subpoena.

Congress has authorized the Department to investigate and prosecute federal healthcare offenses. Accordingly, the Department "may take steps to inform itself as to whether there is probable violation of the law." *United States v. Morton Salt*, 338 U.S. 632, 643 (1950). Indeed, the Department "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642-43. No showing of probable cause is

12

necessary. *See United States v. Powell*, 379 U.S. 48, 57 (1964). And in its investigation, the Department is entitled to any evidence unless it is "plainly incompetent or irrelevant to any lawful purpose" of the Department in investigating federal healthcare offenses. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943).

In accord with these principles, the First Circuit has long recognized that the "requirements for enforcement of an administrative subpoena are not onerous." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). The agency must show that "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Id.* The subpoena to Rhode Island Hospital easily meets these minimal requirements.

Each of the requirements the First Circuit and the Supreme Court have identified are satisfied here. At the outset, the subpoena is plainly within the Department's congressionally-granted authority and seeks information relevant to that authorized investigation. An administrative subpoena meets these requirements if the agency's assertion of investigative "authority is not obviously apocryphal," *Sturm, Ruger & Co.*, 84 F.3d at 5; *accord U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022); *FTC v. Swanson*, 560 F.2d 1, 2 (1st Cir. 1977) (per curiam), and the information sought is "reasonably relevant," *Morton Salt,* 338 U.S. at 652, to the "general purposes of the agency's investigation," *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1268 (7th Cir. 1982) (alteration adopted and quotation omitted))); *see United States v. Trustees of Bos. Coll.*, 718 F.3d 13, 24 (1st Cir. 2013); *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) ("[I]n the pre-complaint stage, … the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation."). And at the subpoena stage, courts do not resolve questions about the agency's "substantive authority

13

to regulate," which are instead to be resolved in any future civil or criminal action that results from the investigation. *Sturm, Ruger & Co.*, 84 F.3d at 5; *accord Swanson*, 560 F.2d at 2.

Here, Congress has expressly authorized the Attorney General to issue subpoenas to investigate potential violations of "Federal health care offense[s]," including qualifying offenses in the FDCA. 18 U.S.C. § 3486(a)(1)(A)(i)(I). The subpoena Plaintiff challenges was issued for that very purpose.

The Civil Division is investigating, among other things, potential violations of the FDCA related to puberty blockers and cross-sex hormones. Rhode Island Hospital houses a "Gender and Sexuality Program" and prescribes the drugs at issue. Doc. 1-3 at 15. The subpoena seeks information relevant to the Department's investigation in two different ways. First, the Department seeks records to determine whether Rhode Island Hospital itself may have engaged in conduct that implicates the FDCA. Second, the Department seeks records from Rhode Island Hospital to determine whether manufacturers and distributors of the drugs at issue may have violated the FDCA.

There are four groups of Requests, all of which extend from January 1, 2020, to the present. Request 1 seeks personnel files to identify who had authority to direct prescribing, billing, or marketing practices and to determine which actors may have liability. Doc. 1-2 at 7. Requests 2 through 6—which seek documents related to billing, insurance claims, and diagnosis coding practices—are informative as to the existence of false billing and the presence of an "intent to defraud or mislead." 21 U.S.C. § 333(a)(2); *see* Doc. 1-2 at 7-8. Requests 7 through 10 seek documents related to the relationship between BCH and drug manufacturers, which can provide evidence of misbranding and fraudulent intent. Doc. 1-2 at 8. For example, communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion, which would be relevant to an FDCA prosecution for

14

misbranding drugs. Finally, Requests 11 through 15 seek patient records, which will allow the Department to assess the scope of the potential violations at issue, identify patterns of misbranding or false billing, and assess fraudulent intent. Doc. 1-2 at 8–9. For example, identifying an instance of false coding typically requires evaluating a patient's medical records to ascertain the patient's actual diagnosis and the patient's billing records to ascertain a mismatch between the patient's diagnosis and the bill submitted to the patient's insurer. *See* Doc. 1-3 at 17–18. That is not a hypothetical: In this investigation, the Department has obtained medical records from other pediatric hospitals that have used pharmaceuticals for gender-related medical interventions, and review of those records has revealed evidence that treatments have been coded as treatment for disorders other than the actual diagnosis, suggesting concealment of off-label use of puberty blockers and hormones. Doc. 1-3 at 15.

Patient records may also be necessary to identify patients' adverse health outcomes, which are often significant in FDCA and other health care offenses. *See* Doc. 1-3 at 18.[4] Obtaining patient records also permits investigators to determine the scale of potential FDCA violations, to compare records to distinguish between one-off billing errors and institutionalized practices suggesting intentional miscoding of treatments, and to generate future investigative leads such as identifying relevant records to request from health benefit programs. Doc. 1-3 at 18–19. Investigations of FDCA and other health care offenses thus regularly involve use of patient records. Doc. 1-3 at 3 (HIPAA subpoenas "are routinely used to obtain … medical, billing, and related information in federal healthcare offense investigations"); *see, e.g.*, *In re*

---

[4]     *See also, e.g.*, Dep't of Justice, *Founder and Chief Executive Officer of Injectable Stem Cell Product Manufacturer Sentenced for Distributing Unapproved Drug* (Sept. 30, 2024), https://perma.cc/JWH4-23UA (highlighting evidence that defendant's conduct was linked to patients' hospitalization); Dep't of Justice, *Owners and CEO of Wholesale Pharmaceutical Company Sentenced for Distributing More Than $92M of Black-Market HIV Drugs* (March 16, 2026), https://perma.cc/X2TR-8JBJ (highlighting trial testimony from patient who was harmed by defendants' conduct).

*Subpoena Duces Tecum*, 228 F.3d at 350; *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001) (enforcing subpoena that included "requests for the files of patients").

For these reasons, the documents the Department seeks are far from "irrelevant to any lawful" FDCA investigation, *Endicott Johnson Corp.*, 317 U.S. at 509, and the relevance requirement is satisfied.

These requests are also "adequately described." *Sturm, Ruger & Co.*, 84 F.3d at 4. There is no meaningful doubt about what records are sought. And to the extent the requests are broad, that flows from the nature of the investigation itself: because the Department's "inquiry" is "a relatively broad one," "the permissible scope of materials that [can] reasonably be sought [is] necessarily equally broad." *McPhaul v. United States*, 364 U.S. 372, 382 (1960); *see Securities & Exch. Comm'n v. McGoff*, 647 F.2d 185, 192-93 (D.C. Cir. 1981) ("We agree that the demands are broad. But the nature of the inquiry precludes a trim list of requests." (footnote omitted)); *cf. Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 348 (1st Cir. 2009) ("[T]here are no cases that universally proscribe the use of 'all documents' language."). The Department's requests are not atypical in this area. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[I]f Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected."); *see also In re Grand Jury Subpoenas Duces Tecum Dated January 30, 1986*, 638 F. Supp. 794, 795–96 (D. Me. 1986) (concluding that grand jury subpoenas in health-care fraud investigation were not overbroad despite necessity that psychiatrist review all 2,500 patient files). Further, the "subpoena commands production of materials covering only a reasonable period of time," currently a little over six years. *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984).

Finally, there is no dispute that the "proper procedures have been employed in issuing the subpoena." *Sturm, Ruger & Co.*, 84 F.3d at 4. The subpoena was signed by the Assistant Attorney General, properly served on Rhode Island Hospital, and calls for the production of nonprivileged documents relevant to the investigation within 500 miles of Rhode Island Hospital. *See* 18 U.S.C. § 3486(a)(3).

### b. Plaintiff's Contrary Arguments Are Meritless.

Plaintiff argues that the requested documents are not relevant to any legitimate FDCA theory, that the Department lacks a proper purpose for the subpoena, and that patient privacy interests outweigh the government's interests in enforcing the laws regulating the distribution of pharmaceuticals. Those arguments all fail.

Plaintiff argues that the subpoena lacks a valid purpose because the Department's FDCA theories are invalid and because medical records are not relevant to the investigation. Both arguments are plainly foreclosed.

**FDCA Liability.** First, Plaintiff argues that the Department has not articulated a valid theory of FDCA liability that it is investigating via the challenged subpoena. That is wrong. As explained, the Department is investigating both whether manufacturers or distributors of puberty blockers and cross-sex hormones are violating the FDCA by engaging in misbranding via off-label promotion (that is, whether Rhode Island Hospital is a witness to others' FDCA violations) and whether Rhode Island Hospital itself has violated the FDCA by causing distribution of misbranded drugs.

Plaintiff never contests that manufacturers and distributors can violate the FDCA's prohibition on misbranding by promoting their drugs for off-label uses. That is all the Court needs to know to reject their argument that the Department lacks any valid FDCA theory.

17

(Plaintiff instead argues that some of the subpoena's requests are not relevant to that investigation, but that distinct relevance argument fails for the reasons explained below.)

Nor can the Court indulge Plaintiff's desire to litigate the possible statutory and constitutional scope of potential FDCA liability for Rhode Island Hospital in a subpoena enforcement posture. *See* Mot. at 26–33. The First Circuit and the Supreme Court alike have repeatedly made clear that subpoena enforcement or quashal proceedings are "summary in nature," *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989), and that courts cannot evaluate the underlying merits of a potential future enforcement action in such proceedings, *Sturm, Ruger & Co.*, 84 F.3d at 5. "[A]n agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction." *Sturm, Ruger & Co.*, 84 F.3d at 5. Were it otherwise, every subpoena recipient could seek to pre-litigate issues of potential liability or statutory coverage, which would "stop much if not all of investigation in the public interest at the threshold of inquiry." *Oklahoma Press*, 327 U.S. at 213. Other courts have repeatedly rejected the same maneuver just as emphatically. *See, e.g.*, *Swanson*, 560 F.2d at 2 (whether agency can enforce FTC Act against subpoena recipient "is not, however, the sort of dispute that ought to be settled in a subpoena enforcement proceeding," even though FTC's "regulatory jurisdiction over appellants" was "clouded"); *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076-77 (9th Cir. 2001) (a subpoena recipient "may not avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit" and cannot raise "factual challenges based on a lack of statutory 'coverage'" of a recipient's activities); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[A] subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); *Am. Target Advert.*, 257 F.3d at 353 (evaluating underlying merits of potential future enforcement action "places the cart before the horse" and falls outside the "scope of inquiry" in subpoena-stage proceedings). That principle

18

dates back over 80 years to Supreme Court decisions rejecting efforts to contest subpoenas based on claims that the investigating agency lacked authority over the matter. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 213-14 (1946); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508–09 (1943).

Regardless, it is at minimum not "obviously apocryphal," *Storm, Ruger, & Co.*, 84 F.3d at 5, for the government to investigate whether Rhode Island Hospital has itself engaged in any conduct that constitutes distributing or causing the distribution of an approved drug with false or misleading labeling for an unapproved use or has conspired with any manufacturer or distributor to misbrand drugs. Doc. 1-3 at 6. Rhode Island Hospital's potential FDCA liability in no way depends on physicians merely writing prescriptions for off-label use.

**Relevance.** Plaintiff also attempts a misbegotten relevance argument, contending that the subpoena's requests for medical records are not "narrowly tailored" to a "legitimate investigative theory." Mot. at 35.

That's not even close to right. The relevance inquiry for administrative subpoenas is "not especially constraining" and must be "generously construed." *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1983). "In the investigatory context, 'ordinary relevance' embodies a broad reading of the concept of relevance." *Trustees of Bos. College*, 718 F.3d at 24. "[T]he governing standard is not 'necessity,'" and courts "have no warrant to decide whether [an agency] could conduct the investigation just as well without" a particular request. *E.E.O.C. v. McLane Co.*, 857 F.3d 813, 816 (9th Cir. 2017). Moreover, the relevance inquiry is keyed to the *investigation*, not to the elements of the potential healthcare offense. *See United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989) (Agency "must show that the information sought by the subpoena is relevant to the purpose of the investigation"); *NLRB v. North Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) ("[T]he focus is on relevancy to the investigation[.]" (quotation omitted)); *E.E.O.C. v.*

19

*Lockheed Martin Corp.*, 116 F.3d 110, 113 (4th Cir. 1997) ("We determine relevancy in terms of the investigation rather than in terms of evidentiary relevance."). In other words, administrative subpoenas can and do permissibly seek information that is not relevant to any element of the offense under investigation, so long as the information advances the investigation itself. Thus, for example, subpoenas may seek information solely to inform future requests that may ultimately go to the elements of the offense under investigation. *See, e.g.*, *Lockheed Martin*, 116 F.3d at 113 (permitting subpoena that sought information to allow agency "to tailor subsequent requests to obtain the most relevant data"); *Federal Express Corp.*, 558 F.3d at 854 (enforcing broad subpoena designed to "help the [agency] craft additional information requests that may produce evidence of discriminatory treatment").

The subpoena's requests for medical records readily meet the standard for relevance. As the Department has explained already, patient medical records can reveal the scope of potential violations, permit identification of billing patterns, provide powerful evidence of intent to misbrand and to conceal violations of federal law by falsely coding diagnoses, identify adverse health outcomes that are directly relevant to prosecutions for healthcare offenses, and generate leads for further investigation.

Last, even if Plaintiff were to prevail on its relevance argument, that could lead at most to quashal of the portion of the subpoena seeking medical records and as to only the small number of people whom Plaintiff represents. Plaintiff never claims that the subpoena's other categories of requests are irrelevant, even on its mistakenly narrow conception of relevance.

### c.    There is no basis to quash the subpoena for improper purpose.

Plaintiff's improper-purpose arguments depend on two errors. First, Plaintiff misstates the standard governing consideration of improper purpose for administrative subpoenas. Second, Plaintiff claims that the administration's policy views amount to an improper purpose. But an

administration's policy view that particular practices or industries should be regulated or even banned cannot immunize those practices or industries from investigations into their compliance with existing federal law. Even if such policy positions could potentially be treated as establishing an improper purpose (despite the absurd consequences that would produce), there is no indication that such an "improper" purpose is the sole purpose for the subpoena, as binding precedent requires.

The Supreme Court has explained that, when called upon to enforce an administrative subpoena, a district court can ensure that "its process" is not "abused." *Powell*, 379 U.S. at 58. "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.*

Given that the improper purpose inquiry asks whether an otherwise valid subpoena seeking evidence relevant to an investigation should nevertheless be quashed or denied enforcement, the Supreme Court has recognized that the subpoena recipient bears a "heavy" burden in proving the subpoena was issued pursuant to an improper purpose. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978); *see United States v. Arthur Andersen & Co.*, 623 F.2d 725, 729 (1st Cir. 1980); *Comley*, 890 F.3d at 542-43 (showing of "firm evidence" required); *United States v. Gertner*, 65 F.3d 963, 967 (1st Cir. 1995) (showing of "specific allegations of bad faith" and "reasonably particularized evidence"). Quashal is only warranted when the "sole purpose" is an improper one. *Gertner*, 65 F.3d at 970; *see Donaldson v. United States*, 400 U.S. 517, 533 (1971) (inquiring whether "the sole objective of the investigation is to" impermissibly use a civil subpoena to "obtain evidence for use in a criminal prosecution"); *Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976) ("It is not … a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the

21

subpoena."); *cf.* Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) (explaining that tort of abuse of process will not lie where there is both a legitimate motive and "an incidental motive of spite or an ulterior purpose of benefit to the defendant"); *Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486, 490 (1st Cir. 1991) ("When process is employed for the purpose for which the law intends its use, no abuse of process occurs even though the person using the process may have an improper motive in addition to his lawful intention.").

Given this heavy burden, it is no surprise that the First Circuit and others have consistently rejected "improper purpose" claims. For example, in *Comley*, the First Circuit rejected an "improper purpose" defense when the subpoena recipient made "forceful allegations about the bad faith of certain [Nuclear Regulatory Commission] officials" uninvolved in the investigation. 890 F.2d at 543. And in *Sugarloaf Funding*, the First Circuit rejected an "improper purpose" argument based on, among other things, an alleged threat of "the imposition of severe penalties if [the subpoena recipients] did not settle" and an alleged threat to the recipients' counsel that the counsel could face a "disciplinary referral" if counsel did not provide complete responses to document requests in another case. 584 F.3d at 349–50; *see also United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 819 (8th Cir. 2012) (per curiam) (rejecting improper purpose argument where "no credible evidence on the record … demonstrate[d] the subpoenas were actually motivated by an improper purpose"); *United States v. Markwood*, 48 F.3d 969, 983–84 (6th Cir. 1995) (rejecting improper purpose argument and concluding that the Plaintiff's claimed "'evidence' of impropriety … [wa]s merely an assertion of impropriety, and d[id] not amount to a substantial demonstration that the government [wa]s abusing the court's process").

There is no basis for concluding that the subpoena to Rhode Island Hospital was motivated solely by an improper purpose.

**1.** Plaintiff focuses principally on statements expressing the Executive Branch's views opposing gender-related medical interventions for children as untested, unsafe, unnecessary, and unethical. Those policy views—which rest on a "rational basis," *United States v. Skrmetti*, 605 U.S. 495, 523 (2025)—cannot immunize entire industries or practices from scrutiny to determine if they have complied with existing federal law by establishing an improper purpose for any such investigation.

There is no dispute that the President, Attorney General Bondi, and others in the administration have expressed strong moral, ethical, and policy opposition to the practice of irreversibly altering minors' bodies as a way to address diagnoses of gender dysphoria. The administration believes these interventions are untested, unsafe, unnecessary, and unethical— concerns that are gaining traction within the medical community in the United States and abroad. *See* Admiral Brian Christine, *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* ("HHS Statement"), Dep't of Health & Hum. Servs. (Dec. 18, 2025), https://health.gov/sites/oash/files/Message_Pediatric_Gender_Dysphoria_Treatment.pdf; Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (Nov. 19, 2025), https://perma.cc/MUB7-2ETU. At the same time, the executive orders, Bondi Memo, and Shumate Memo do not purport to declare those interventions categorically unlawful or to change federal law in any respect. They merely direct investigations (and, if appropriate, enforcement actions) designed to enforce existing federal health care laws against entities in this industry. There is nothing bad-faith or pretextual about that. The Department is simply prioritizing enforcement of federal law in an industry of special concern for policy reasons.

Plaintiff's conflation of policy opposition with improper purpose is misguided. An administration's policy statements on a particular topic have never amounted to an improper reason to issue a subpoena or further an investigation into whether a particular federal law has been violated. *Cf. Department of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Trump v. Hawaii*, 585 U.S. 667, 706–07 (2018). Such logic would immunize from investigation any industry or practice that an administration is opposed to as a policy matter.

By that logic, an administration that takes a position on a particular policy question necessarily renders any investigation that touches on that policy as pretextual. That logic would preclude government investigations into anything touching on gender-related treatment—from fraud on government insurance to drug adulteration—effectively immunizing illegal conduct in this space. And it would produce absurd and harmful consequences across the board. Consider an administration that publicly advocated for a federal ban on sports gambling, while simultaneously seeking to ensure that the industry, where lawful, carried out its activities in a manner consistent with existing federal law. On Plaintiff's logic, tax or other investigatory subpoenas to sports gambling operations and related businesses could be quashed based on the administration's opposition to such gambling. Similarly, an administration that pursued or supported new legislation that would ban or limit practices of large technology or social media companies could see subpoenas related to ensuring that those practices comply with existing law quashed on the same basis.

Or consider an administration that supports new gun control measures, while heightening its enforcement of existing regulations governing firearm dealers. Applying Plaintiff's reasoning, subpoenas issued in any of those investigations would have to be quashed based on improper

purpose. The government's opposition to a particular industry or practice does not immunize that industry or practice from scrutiny to ensure that it is being carried out in a lawful manner. Just as sports gambling companies would not be immunized from scrutiny if a future administration sought to ban them, actors engaged in the sorts of activities at issue here are not immunized from compliance with existing federal law—or from a response to an otherwise-lawful subpoena designed to ascertain if violations of existing federal law have occurred.

That is not the law. Accepting Plaintiff's argument would contravene the well-established doctrine that the Executive Branch has the power to exercise enforcement discretion in prioritizing what misconduct to investigate. "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 678–79 (2023). Indeed, under Article II, the Executive Branch possesses the "exclusive authority and absolute discretion," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotation omitted), to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws," *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), and "the Government's enforcement priorities" are a legitimate consideration in decisions about whether to prosecute, *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Here, at most, Plaintiff's logic could support an inference that the Department is focusing on misconduct by drug companies, insurers, and medical clinics engaged in providing "gender-affirming care" to minors because of the administration's broader policy concerns with that activity. Even if so, that is entirely permissible, and certainly not an "improper purpose" sufficient to quash a subpoena. Nothing in *Powell* or First Circuit cases suggests otherwise. There

25

is simply no inconsistency between an administration's desire for a disfavored practice to end and an administration's desire to ensure that current federal law is enforced.

The few statements that Plaintiff tries to stretch beyond mere policy opposition to pediatric gender-related medical interventions do no such thing, on any fair reading. For example, the public statement that the Department is "[W]orking on it" clearly referenced the previous speaker's suggestion that the Department should investigate and prosecute use of "diagnosis codes that were … fraudulent" in order to "h[o]ld accountable" providers who are breaking the healthcare fraud laws—a plainly permissible purpose. Transcript of The Dangers of "Gender-Affirming Care" for Minors, Federal Trade Commission (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf. Plaintiff also misleadingly quotes a Department of Justice attorney at a hearing in another subpoena quashal action as saying that the Executive Branch's policy desire "to reduce or eliminate gender-related care to minors" is "what this investigation is about." Doc. 1 at 23 (quoting *In re Administrative Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. Sep. 1, 2025), Doc. 30, at 25). As a review of the cited transcript reveals, in making the same argument that policy views could not provide a basis to quash a subpoena advanced here, the attorney stated twice within the same sentence that the "investigation is about" the medical treatments at issue here: "medicalized gender-related care to minors" or "medicalized gender-affirming care of minors." *In re Administrative Subpoena*, Doc. 30, at 25. That is no more than a correct description of the scope of the investigation. Similarly, Plaintiff cites a July 9 press release stating that the Department of Justice has sent subpoenas "to doctors and clinics involved in performing transgender medical procedures on children" and that the Department is investigating "healthcare fraud, false statements, and more." Press Release, U.S. Dep't of Just., *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender*

26

*Medical Procedures on Children* (July 9, 2025), https://perma.cc/XL8X-X7J2. In the press release, the Attorney General promised to hold individuals or entities "accountable" for "healthcare fraud, false statements," or other violations of the law. *Id.* That is a core duty of the Executive Branch, not an improper purpose for an investigation. A White House press release announcing hospitals and clinics that have stopped providing puberty blockers, hormone therapy, and sex-change surgeries to children, without reference to any subpoenas or investigations whatsoever, further illustrates Plaintiff's inability to grapple with the basic issue presented here. Nor is it at all surprising, improper, or inaccurate for the Department to refer to efforts to enforce patient protection laws like the FDCA as seeking to "protect innocent children." Mot. at 38.

Plaintiff's claim (at 37) that the Department issued subpoenas "without any particularized allegations of wrongdoing" at specific hospitals entirely mistakes the relevant burdens. Subpoenas themselves do not include a statement of their evidentiary purposes, nor are they required to do so. And even in enforcement proceedings, it is long established that administrative subpoenas permit an agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," in a role "analogous to the Grand Jury." *Morton Salt*, 338 U.S. at 642-43.

Finally, Plaintiff's argument makes no sense on its own terms, since the subpoenas do not and cannot "end[]" the interventions the administration opposes. The subpoenas merely seek information so the Department can investigate—and, if appropriate, prosecute—federal criminal offenses that nobody disputes may occur in connection with puberty blockers and cross-sex hormones. The Department does not contend that the act of writing a prescription for an off-label use would, in and of itself, give rise to FDCA liability. But it is beyond question that such drugs may be misbranded in violation of federal law or that a hospital could engage in fraudulent billing practices related to such drugs.

Ensuring that such violations have not occurred with respect to those drugs is plainly a legitimate purpose, and that is precisely what the Bondi and Shumate memoranda direct be investigated: potential FDCA violations "by manufacturers and distributors engaged in misbranding by making" purported "false claims about the on- or off-label use of puberty blockers, sex hormones," and similar drugs, Bondi Memo 4, and investigations of "doctors, hospitals, pharmaceutical companies, and other appropriate entities . . . [including] possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs," Shumate Memo 2-3.

**2.** At all events, even if an administration's policy views might be treated as an improper purpose, there is no basis for quashing the subpoena here. As discussed, the First Circuit has recognized that an improper purpose must be the "sole purpose" of the subpoena for quashal to be proper, *Gertner*, 65 F.3d at 970, such that the subpoena cannot be quashed based on purportedly mixed motives. For example, in the sole case of which the government is aware where the First Circuit concluded that a subpoena should be quashed based on improper purpose, the subpoena recipient demonstrated that the Internal Revenue Service had issued a subpoena purportedly to investigate the recipient law firm's compliance with the tax laws but in fact was solely interested in investigating the firm's clients, thereby circumventing statutory limits on IRS "John Doe" subpoenas. *Id.* at 965–66, 69.

Here, there is no serious doubt that the Department is in fact pursuing a real investigation, and that such an investigation is within the Department's statutory authority. It is undisputed that Rhode Island Hospital prescribes puberty-blockers and other drugs that have never been FDA-approved for treating gender dysphoria. And, as discussed further below, even if Rhode Island Hospital has not itself violated federal law, Rhode Island Hospital may have communicated with

28

pharmaceutical companies who have. Indeed, neither Rhode Island Hospital nor Plaintiff has ever argued that Rhode Island Hospital lacks evidence relevant to the Department's investigation. That is enough to demonstrate that the Department has a permissible purpose for the subpoena. A holding that mixed motives are sufficient for quashal would mean that no investigation—no matter how compelling the facts or indications of wrongdoing—could proceed so long as a particular administration continued to hold policy views on the relevant topic.

####    d.   Plaintiff's privacy-based arguments fail.

Plaintiff also argues that children's privacy interests in their medical records should outweigh the government's interest in the information sought, even if the subpoena is validly issued. That mistakes governing law, too.

As the Fourth Circuit has previously concluded, "[t]he government has a compelling interest in identifying illegal activity and in deterring future misconduct," and that interest "outweighs the privacy rights of those whose [medical] records" are sought via a properly issued HIPAA subpoena, "particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351. That is especially so because "patients have a reduced expectation of privacy in patient records," given that nearly every patient has agreed pursuant to their insurance policies and releases to allow their medical records to be reviewed." *Id*. Other courts have likewise readily concluded that HIPAA subpoenas can be used to obtain medical records—an unsurprising conclusion in the context of a statute enacted to protect patient privacy while permitting government investigations. *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001) (enforcing subpoena that included "requests for the files of patients").

Here, Plaintiff's claimed expectation of privacy in records is incompatible with the functional realities of modern medical practice and the disclosures that Rhode Island Hospital

29

provides to patients and their families. *See* Lifespan's Summary Notice of Privacy Practices, https://www.brownhealth.org/sites/default/files/lifespan-files/documents/Lifespan-Joint-Privacy-Notice.pdf ("RIH NPP") (attached hereto as an exhibit). The NPP identifies over 20 categories of circumstances in which Rhode Island Hospital advises patients that it can and will share their information, including notice that it may be provided in response to a subpoena, for insurance billing, for training purposes, for research, and even for fundraising. *Id.*

That is standard practice. The delivery of health care today requires the routine disclosure of personal health information through a network of clinicians, laboratories, pharmacies, quality assurance and utilization reviewers, insurers, billing intermediaries, third-party administrators, accreditation bodies, and regulators. That is just the reality of modern health care—patient medical information is routinely shared across multiple third parties. Each of these entities access parts (or all) of a patient's record as a routine feature of delivering and financing medical care. For example, insurers often require detailed clinical documentation before paying claims; administrative staff and billing personnel routinely handle and access patient charts; and third-party laboratories and pharmacies likewise often receive detailed information contained in patient charts. But information is also routinely shared, as is requested here, for regulatory compliance and public health monitoring. Patients understand this reality not only because it is reflected in ordinary interactions with their physicians, office staff, and insurers, but also because that understanding is formalized through a federally-required Notice of Privacy Practices given to each patient by the health care provider. *See* 45 C.F.R. § 164.520 (generally requiring that insurance companies and health care providers provide notice to individuals about how entity may use and disclose protected health information about individual).

Again, to emphasize: Rhode Island Hospital informs its patients that it "may release" their "protected health information to a law enforcement official," "in response to … subpoenas."

RIH NPP at 7. Given that disclosure, the notion that patients could have a reasonable expectation that their medical information would remain shielded from a lawful federal subpoena is unsustainable. And the possibility that information obtained through law enforcement purposes via subpoena could be further shared with state law enforcement officials as expressly authorized by federal law changes nothing about that analysis. *See* 5 U.S.C. § 552a(b)(7); Mot. at 16, 42.

Plaintiff attempts several more arguments as afterthoughts. *First*, Plaintiff argues that the subpoena impermissibly "targets patients because of their transgender identity," in violation of the Equal Protection Clause. Mot. at 43. Not so. The subpoena seeks records of the only patients that are relevant to the investigation. Under any standard—even strict scrutiny—that would be permissible, because the government has a "compelling interest in finding, convicting, and punishing those who violate the law," *Samia v. United States*, 599 U.S. 635, 655 (2023) (citation omitted), and the request is narrowly tailored to the patients whose records are relevant to the investigation at issue. Indeed, a contrary ruling would endanger the government's ability to investigate or prosecute crimes that target minorities. How else would the government investigate, for example, a tax preparer who intentionally defrauded members of a certain race, or a doctor who systematically preyed on his female patients? And "remedying" the request's limitation to patients seeking gender-related medical interventions could paradoxically require the government to request *more* patients' medical records in order to avoid being accused of seeking records "based on [the patients'] transgender status." Mot. at 43.

*Second*, Plaintiff argues that disclosure would harm the physician-patient relationship. Plaintiff cites no law in support of this argument. *See* Mot. at 44–45. The Court should decline Plaintiff's invitation to impose its own policy views on this matter. Congress has provided, and courts have recognized, that medical records can be obtained via HIPAA subpoena when relevant to an investigation. Congress is entitled to make the judgment whether law enforcement needs

outweigh any putative risks to physician-patient relationships, and it has done so. *See* 18 U.S.C. § 3486; *see, e.g.*, *Whalen v. Roe*, 429 U.S. 589, 602 (1977) (rejecting a similar argument raising concern that "some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention").

*Finally*, Plaintiff references Rhode Island law, suggesting that the subpoena interferes with Rhode Island's regulation of the practice of medicine or its own state courts. But state-law rights or restrictions on state courts cannot immunize the manufacturers and distributors of puberty blockers or cross-sex hormones—or Rhode Island Hospital—from compliance with federal law. If a manufacturer, distributor, or hospital committed a federal healthcare offense in the provision of puberty blockers or cross-sex hormones, Rhode Island law would provide no defense. *See Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (per curiam) ("[A] State has no power to confer immunity from federal causes of action." (emphasis omitted)). That would be true no matter the industry or issue. Just as a casino operating in a state in which sports gambling is legal would not be exempt from compliance with existing federal law.

Nor does it matter that Rhode Island permits these interventions for minors. Plaintiff may not be engaged in evasion of a state ban through improper billing, but that is not the question in this investigation. As noted, Plaintiff may have evidence relevant to misbranding by others in the healthcare industry. Moreover, legitimate billing codes may be misused to mislead insurance companies or others into covering puberty blockers for older children with gender dysphoria, so the mere existence of a diagnosis code for particular interventions does not preclude investigation. Nor, finally, can Rhode Island law interfere with the Department's congressionally conferred investigative powers. To the extent there is a conflict between state and federal law regarding disclosure of medical records, federal law prevails. *See* 18 U.S.C. § 3486(d) (conferring immunity from liability from any contrary federal, state, or local law against

disclosure of subpoenaed materials); *see, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) ("[U]nder the Supremacy Clause … any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." (internal quotation marks omitted)).

**IV.    Any relief cannot extend beyond the minors in DCYF care or custody.**

Should the Court grant any portion of Plaintiff's motion, any resulting order must be strictly limited to the relief necessary to redress the injuries to individuals before the Court. As discussed, a plaintiff in federal court has standing to challenge federal action only when that action inflicts an injury on the plaintiff. *See All. For Hippocratic Med.,* 602 U.S. at 380. A corollary of this principle is that a "litigant cannot, by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quotation omitted)). Translated to the facts here, the above precedents establish that the Child Advocate lacks standing to seek quashal of the entire subpoena or an order directing Rhode Island Hospital not to comply in full. Mot. at 45. Instead, because the Child Advocate sues to vindicate the privacy interests of children in DCYF custody, Mot. at 20, the Child Advocate can seek only a remedy that is tailored to these limited interests. In other words, large portions of the subpoena—such as, for example, the subpoena's requests for communications between pharmaceutical companies and RI Hospital, *see* Doc. 1-2 at 8—are not subject to challenge by the Child Advocate because those requests do not injure those whom the Child Advocate is statutorily obliged to protect.

Accordingly, even if the Court disagrees with the Department's other arguments, the Court should conclude that the Child Advocate only has standing to challenge the subpoena to the extent it seeks information concerning minors in DCYF custody and should limit any relief to those requests and those specific individuals. *See In re Children's Nat'l Hosp.,* No. 1:25-CV-

33

03780-JRR, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) ("The court declines, however, to quash the Subpoena for persons other than Movants. … Movants have not persuaded the court that they have standing to raise the matter for persons not parties before the court."). To conclude otherwise would be to flout bedrock limitations on third-party standing and, more fundamentally, the power of the courts. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). It would also transgress the Supreme Court's constant instruction that any form of equitable "relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025) ("Complete relief is not a guarantee—it is the maximum a court can provide.").

## CONCLUSION

This Court should deny the motion in its entirety and dismiss the suit.

Dated: this 7th day of May 2026.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch

*/s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2026, I electronically filed this Opposition and it is available for viewing and downloading from the Court's CM/ECF System, and the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN
Assistant Director

35