UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital | Misc. Action No. 26-mc-07-MSM-AEM |

**THE CHILD ADVOCATE'S REPLY
IN SUPPORT OF THE MOTION TO QUASH**

The government's opposition only serves to confirm why relief is necessary from this Court. The Department of Justice (DOJ) asks the Court to accept a boundless view of its subpoena authority: that the government may announce a campaign to end a category of lawful and state-protected medical care, issue sweeping subpoenas to providers of that care explicitly for that purpose, demand the identities and intimate medical records of children who received the care, obtain same-day enforcement in a distant forum without any adversarial process, and then defeat review by invoking the presumption of regularity. That is not the law.

The Child Advocate asks only that the Court enforce the limits Congress and the Constitution impose on administrative subpoenas. Seven federal court decisions, confronting identical subpoenas issued as part of the same nationwide campaign, have recognized the fatal defects of identical subpoenas and quashed or limited them. The government's arguments in those cases, repeated here, have been rejected each time, and its post-hoc rationalizations cannot supply the lawful purpose, relevance, or proportionality the Constitution requires. The fact that the government does not even attempt to distinguish or explain why any of those seven decisions were mistaken speaks volumes. This Court should likewise quash the Subpoena.

1

## ARGUMENT

### I.    The Child Advocate Has Standing To Challenge the Subpoena.

The government's threshold argument that the Child Advocate lacks standing to challenge a subpoena that seeks the medical records of children in her statutory care misreads both Article III and caselaw establishing third-party standing to challenge subpoenas.

### A.    The Child Advocate Satisfies Article III Standing Requirements.

To establish Article III standing, a plaintiff must demonstrate "(1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, the children on whose behalf the Child Advocate brings this motion would be injured in fact by the invasion of their privacy from disclosure of their confidential medical records. As the Supreme Court reaffirmed last week, an injury sufficient to establish standing "does not arise only when a defendant causes a tangible harm to a plaintiff, like a physical injury or monetary loss. It can also arise when a defendant burdens a plaintiff's constitutional rights." *First Choice Women's Res. Centers, Inc. v. Davenport*, No. 24-781, 2026 WL 1153029, at *8 (U.S. Apr. 29, 2026). The threat that a subpoena will burden constitutional rights, including "protected First Amendment advocacy the government disfavors," like the Subpoena at issue here, "is more than enough to establish injury in fact under" Supreme Court precedents. *Id*. The cause of this constitutional injury is the Subpoena, and the injury is redressable by quashing it. *See In re Grand Jury*, 111 F.3d 1066, 1071 (3d Cir. 1997).

2

The Child Advocate has an express statutory mandate to "take all possible action including, but not limited to . . . formal legal action, to secure and ensure the legal, civil, and special rights of children" in the care or custody of the Rhode Island Department of Children, Youth, and Families (DCYF). R.I. Gen. Laws § 42-73-7. This Court has already recognized that the Child Advocate "has the right to intervene in any case where a child's safety, education, and physical and mental welfare are not being met, and if a resolution cannot be reached, [the Child Advocate] can initiate litigation on the child's behalf." *Off. of the Child Advocate on Behalf of Jane Doe v. Providence Pub. Sch. Dep't*, No. 25-CV-649-JJM-AEM, 2026 WL 1068031, at \*4 (D.R.I. Apr. 20, 2026).

Moreover, a party's standing to challenge a non-party subpoena is well established where the movant has a personal right or privilege in the materials sought. *See Ponder v. Ocwen Loan Servicing, LLC*, No. CV 19-MC-91215-ADB, 2019 WL 2249675, at \*2 (D. Mass. May 24, 2019) (citations omitted). The personal right or privilege claimed need not be weighty: parties need only have *some* personal right or privilege in the information sought to have standing to challenge a subpoena to a third party." *Id.* (citations omitted). Patients, like those the Child Advocate represents here, have a personal right in the confidentiality of their medical records sufficient to confer standing. *See In re Children's Nat'l Hosp.*, No. 1:25-CV-03780-JRR, 2026 WL 160792, at \*4-6 (D. Md. Jan. 21, 2026); *In re: 2025 UPMC Subpoena*, 2025 WL 3724705, at \*1 (W.D. Pa. Dec. 24, 2025). The Child Advocate, exercising her statutory authority to protect those patients' rights, necessarily has standing as well.

3

### B.  The Constitutional Privacy Rights of Rhode Island's Children Are Real and Weighty.

In an effort to avoid the settled authority that a movant with a legally cognizable interest in the materials sought has standing to challenge a subpoena, the government contends Rhode Island's children do not have a constitutional right to privacy in their most intimate medical records. That argument is flat wrong. The records at issue are among the most sensitive medical records a child can have. They may reveal gender identity, mental-health history, suicidal ideation, bullying, trauma, family conflict, foster-care placement, abuse or neglect history, parent and guardian information, and details about clinical decision-making. For children in DCYF care, the privacy harm is even more acute. These children are uniquely vulnerable and often have already experienced trauma and breaches of trust.

In the First Circuit, courts recognize both autonomy and informational privacy interests under the Fourteenth Amendment. *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 182-83 (1st Cir. 1997). District courts in the First Circuit have specifically held that forced disclosure of transgender status violates constitutional privacy rights. *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018). And the First Circuit has recognized that medical records are entitled to heightened protection because they contain "sensitive medical history . . . patients' complaints and symptoms, and the patients' family members." *Ricco Jonas*, 24 F.4th at 736; *see also Conforti v. St. Joseph's Healthcare Sys.*, No. 2:17-cv-00050-CCC-CLW, 2019 U.S. Dist. LEXIS 138433, at *6 (D.N.J. Aug. 14, 2019) ("Because the third-party subpoenas here relate to [the moving party's] medical information and [the moving party] claims

4

his medical information is privileged, he has standing to move to quash the subpoenas."). Here, the Subpoena seeks children's gender identity, mental-health history, family and foster-care information, diagnoses, consent records, and treatment history in the context of DOJ's avowed campaign criminalizing the care itself. That is far removed from routine government recordkeeping or ordinary healthcare oversight.

### C.    Section 3486 Does Not Strip the Child Advocate of Standing.

DOJ's standing argument depends on treating § 3486(a)(5) as both a sword and a blindfold. According to DOJ, only the recipient of the Subpoena may move to quash, and only before the return date, while the children whose records are demanded receive no notice, may be barred from ever learning that their records are being sought, and then, if they do learn, barred from moving to quash because they did not learn earlier. That reading would allow the government to secretly subpoena children's medical, psychiatric, family, and foster-care records, obtain enforcement in another district without notice, and then argue that the children's challenge is barred because a deadline expired before they knew they needed to act. Nothing in § 3486 requires that absurd and dangerous result.

Section 3486(a)(5) supplies a statutory procedure for the "person or entity summoned." It does not say that no one else may protect independent constitutional rights in records held by a third party. Congress does not silently preclude judicial review of constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so

5

must be clear."). Nor does a statute giving a subpoena recipient a procedural mechanism to move to quash eliminate the ordinary rule that a person whose own legally protected interests are implicated by a subpoena may seek judicial protection.

To the contrary, § 3486 expressly incorporates the standards applicable to judicial subpoenas. *See* 18 U.S.C. § 3486(a)(7). Those standards include Federal Rule of Civil Procedure 45, which requires courts to quash or modify subpoenas that impose undue burdens on any "person," including non-parties, and considers burdens such as invading privacy or confidentiality interests. *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 42 (1st Cir. 2003)*; see also Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs[.]").

The Child Advocate is not asserting RI Hospital's rights, nor is she suing to enforce HIPAA's administrative privacy regulations or seeking damages.[1] The Child Advocate is asserting the rights of children in Rhode Island that state law charges her to protect: the legal and civil rights of children in DCYF custody or care. *See* R.I. Gen. Laws § 42-73-7. The Child Advocate seeks nonmonetary relief from unlawful federal action that exceeds § 3486 and violates constitutional privacy rights. The lack of a private damages remedy in HIPAA does not bar constitutional review. Those children face concrete injury from disclosure of their identities, diagnoses, mental-

---

[1] The government's citation to *Borges v. Rhode Island Dep't of Child. Youth & Fams.*, No. 1:25-CV-00124-MSM, 2025 WL 2918351, at *2 (D.R.I. Oct. 14, 2025), is inapposite as a result.

health records, family information, foster-care circumstances, and gender identity to federal prosecutors as part of a campaign publicly directed at demonizing and ending the medical care they received.[2] That injury is traceable to the Subpoena and redressable by quashing it.

The government argues that *In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000), categorically resolves the privacy question in its favor. It does not. First, that decision is not binding on this Court, and to the extent it suggests medical records are not entitled to any constitutional privacy rights, it contradicts binding First Circuit precedent. And even on its own terms, the decision "reflects a case-specific balance of interests, not a determination Section 3486 inherently provides constitutionally sufficient privacy protection for all subpoenaed medical records 'as a matter of law.'" *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at \*23 (E.D. Pa. 2025).

And critical differences compel a different result here. In the Fourth Circuit case, the investigation targeted a specific physician suspected of concrete billing fraud based on particularized evidence. 228 F.3d at 350. Here, the government has identified no alleged violation at RI Hospital. It instead objects to an entire category of

---

[2] Indeed, the 2025 U.S. National Survey on the Mental Health of LGBTQ+ Young People, released by the Trevor Project, found that 40% of transgender and nonbinary young people seriously considered attempting suicide in the past year. Those transgender and nonbinary young people who sought medical care to treat gender dysphoria but could not access it were nearly twice as likely to attempt suicide as those who could access the care. Nath, R., Matthews, D.D., Hobaica, S., DeChants, J.P., Eden, T.M., Taylor, A.B., & Suffredini, K. (May 6, 2026). 2025 U.S. National Survey on the Mental Health of LGBTQ+ Young People. *The Trevor Project*. https://doi.org/10.70226/EKGT3197 (last visited May 7, 2026).

lawful medical care and seeks years of patient records absent any institution-specific showing.

DOJ's reliance on "the limitation placed on uses of subpoenaed information by § 3486" proves the opposite of its claim. Congress did not declare patient-identifying health information ordinary business material. It imposed special use restrictions and required courts, when good cause is sought, to weigh the public interest and need for disclosure against injury to the patient, the physician-patient relationship, and treatment services. That framework is inconsistent with DOJ's assertion that patient identities may be collected reflexively whenever investigators say "healthcare of-fense."

The Child Advocate satisfies Article III, and her statutory authority under Rhode Island law confirms that she is the proper representative to assert these chil-dren's interests. The government's position—that children whose most intimate med-ical records are seized by the federal government have no forum to vindicate their constitutional rights—is untenable.

### D.    The Child Advocate Has APA Standing Independent of § 3486.

In this case, the Child Advocate seeks nonmonetary relief to prevent unlawful federal action that exceeds statutory authority and violates constitutional privacy rights. Section 702 of the Administrative Procedure Act waives sovereign immunity, and provides standing, for a person "suffering legal wrong because of agency action" who seeks relief "other than money damages." 5 U.S.C. § 702; *Harper v. Rettig*, 46 F.4th 1, 6 (1st Cir. 2022). The waiver is not limited to claims brought under the APA itself: "This waiver of sovereign immunity encompasses claims asserted under the

APA as well [as] claims arising under non-APA authority that seek equitable relief from agency action." *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 142 (D. Md. 2020). The Child Advocate seeks only declaratory and injunctive relief to prevent enforcement of a subpoena that compels disclosure of children's medical records; such a decree may run against the United States or responsible federal officers. 5 U.S.C. § 702. Section 702 applies by its plain terms.

**E.    The Child Advocate Challenges the Subpoena, not a Court Order, and Seeks Relief Against the Government that Would Redress the Injury.**

The government attempts to frame the Child Advocate's motion as an effort to undo the order from the Northern District of Texas, but that mischaracterizes the relief sought. The Child Advocate's primary request is quashal of the Subpoena itself, the underlying instrument of compulsion that predates the enforcement proceeding in Texas by ten months. The injury here is DOJ's acquisition, use, and dissemination of constitutionally protected medical information of children through an unlawful Subpoena. A determination by this Court that the Subpoena is unlawful operates directly on the government's authority to enforce it, not another Court's order. The government is a party to this case and can be ordered not to enforce an unlawful subpoena or to use records obtained through it. *See In re Grand Jury*, 111 F.3d 1066 (3d Cir. 1997) ("The causes of this injury are the subpoena and the government's motion to compel, and the injury is redressable by quashing the subpoena."). That is party-specific relief directed at the defendant, the paradigmatic form of redress.

Moreover, the redressability requirement is not a license for the government to immunize its subpoenas from judicial scrutiny by racing to the most favorable forum. *See First Choice Women's Resource Ctr.*, 2026 WL 1153029, at \*10 (U.S. Apr. 29, 2026) (reaffirming availability of judicial review of subpoenas to protect constitutional rights).

## II.   The Collateral Attack Doctrine Does Not Apply.

The collateral attack doctrine does not apply to this matter because DOJ cannot establish the statutory predicate for enforcement in the Northern District of Texas under § 3486(c). As the very cases the government relies on for its argument make clear, this Court should not dismiss the matter under the collateral attack doctrine "without first determining that [Northern District of Texas] in fact had jurisdiction to enter [the order compelling RI Hospital to comply with the subpoena.]" *Pratt v. Ventas, Inc.*, 365 F.3d 514, 520 (6th Cir. 2004). When a plaintiff "alleges that the original court lacked jurisdiction over the case," as the Child Advocate does here, the collateral attack doctrine simply does not apply. *Republic Bldg. Co., Inc. v. Charter Twp. of Clinton, Michigan*, 81 F.4th 662, 667 (6th Cir. 2023). Independently, the doctrine does not apply because the Child Advocate was not a party to the Northern District of Texas matter. *See* May 8, 2026 Text Order ("the Child Advocate was not a party to the Texas proceeding, had no notice of those proceedings, and had no opportunity to be heard there").

### A.   Venue Was Improper in the Northern District of Texas.

DOJ's claim that the court in the Northern District of Texas had jurisdiction to compel compliance with the Subpoena is based solely on 18 U.S.C. § 3486(c), which

provides that "the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena." The subpoenaed entity in this case, RI Hospital, is an inhabitant of, and carries on business only in, Rhode Island. The only basis for DOJ's decision to bring an enforcement action in the Northern District of Texas is thus its assertion that Texas is "where this nationwide investigation is being carried on." ECF No. 9 at 2. That assertion is conclusory, and contrary to all the available information in the record.

Courts interpreting the phrase "within the jurisdiction of which the inquiry is carried on" have concluded that it "is ambiguous." *N.L.R.B. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198, 1201 (D.C. Cir. 2006). As a result, those courts "have articulated a two-part test for determining the location of an investigative inquiry for purposes of district court jurisdiction to enforce agency subpoenas: (1) whether the location bears a sufficiently reasonable relation to the subject matter of the investigation, and (2) whether the agency's choice of this location for enforcement exceeds the bounds of reasonableness." *Id*. (cleaned up). As part of that test, the D.C. Circuit looked to determine the place where: 1) the "hub" of national investigative activity took place; 2) the agency made the decision to authorize the investigation; 3) the subpoenas were issued; 4) correspondence from the agency emanated; 5) the agency believed that unlawful actions had occurred; 6) the documents and witnesses were located; and 7) the headquarters of the subpoenaed company was located. *See U.S. Int'l Trade Comm'n*

11

*v. ASAT, Inc.*, 411 F.3d 245, 249 (D.C. Cir. 2005); *FEC v. Comm. to Elect Lyndon LaRouche*, 613 F.2d 849, 856–57 (D.C. Cir.1979).

Not one of those factors points to the Northern District of Texas in this case. The Hsiao Declaration states that the investigation is being conducted by DOJ's Civil Division/Enforcement and Affirmative Litigation Branch in Washington, D.C. ECF No. 1-3. The Hsiao Declaration does not even mention Texas. *Id*. DOJ made the decision to authorize, and publicly announced, the investigation in Washington. The Subpoena was issued by DOJ in Washington, and commanded RI Hospital to produce records in Washington, not Texas. And, as the evidence submitted by RI Hospital to support its motion for a stay from the Northern District of Texas makes clear, "the entirety of the investigative contact" between RI Hospital and the government establishes that the hub of investigative activity is the District of Columbia. *In the Matter of Administrative Subpoena 25-1431-032*, No. 4:26-mc-00006-O, ECF No. 7 at 7 (N.D. Tex. May 6, 2026). All of the evidence points to the District of Columbia as the investigative hub. Not a shred of evidence points to Texas.

Beyond that, any activity that DOJ believes to be unlawful could only have occurred in Rhode Island. The documents and witnesses are in Rhode Island. The patients, parents, guardians, providers, DCYF, and Child Advocate are in Rhode Island. RI Hospital is headquartered in Rhode Island, and carries on business only in this state. As a result, the Northern District of Texas bears no "reasonable relation to the subject matter of the investigation" and DOJ's choice of that location for its enforcement action "exceeds the bounds of reasonableness." Even to the extent the

12

Court credits the government's assertion that its investigation of RI Hospital is "nationwide in scope," venue cannot simply be based on the government's "choice of any forum it like[s]." *Cooper Tire*, 438 F.3d at 1202. The Northern District of Texas was not a proper venue for the government's enforcement action, so the fact that DOJ obtained a same-day, non-adversarial enforcement order against RI Hospital does not eliminate this Court's authority to adjudicate the Child Advocate's independent constitutional claims against the government now. *Pratt*, 365 F.3d at 520.

In the alternative, to the extent the Court is inclined to consider the government's conclusory assertion that its investigation of RI Hospital is being carried on in the Northern District of Texas, contrary to all of the evidence above, the Child Advocate respectfully requests that the Court retain jurisdiction, and preserve the status quo by entering an order prohibiting DOJ from receiving, using, or retaining the information it seeks in the Subpoena, so that the Child Advocate can conduct discovery on the question of where the investigation is, in fact, being carried on.

**B.    The Collateral Attack Doctrine Does Not Apply to Nonparties.**

The Child Advocate was not a party to the Northern District of Texas proceeding, received no notice of it, and had no opportunity to be heard to protect the interests of Rhode Island children as part of it. *See* May 8, 2026 Text Order. Due process requires notice and an opportunity to be heard before a person can be deprived of a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Northern District of Texas order was entered the same day DOJ's petition was filed, without any opposition, in a district with no connection to the subpoena, the hospital, or the patients

13

whose records are sought. That order cannot preclude the Child Advocate's independent challenge in this Court, which is unquestionably a proper forum. "One is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). An enforcement order that cannot bind the Child Advocate cannot deprive her of standing to pursue her own independent claims in her own forum.

Each case the government cites in support of its collateral attack argument involves a party (or someone in privity with a party) who had notice and an opportunity to litigate in the first proceeding and then sought to relitigate the same issues in a different court. That is not what is happening here. The collateral attack doctrine exists to prevent parties from relitigating what they already had a chance to contest. It does not apply to bar a nonparty who never had that chance.

### III.    The Motion Is Not Time-Barred, and RI Hospital Could Not Waive the <u>Children's Rights.</u>

The return date limitation in § 3486(a)(5) applies to a subpoena recipient's statutory motion only. It does not bar the motion to quash, brought by a statutory advocate, from protecting children's independent constitutional rights after learning that their records are subject to imminent compelled disclosure. District courts "have broad discretion over the decision to quash a subpoena." *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 516 (S.D.N.Y. 2022) (internal citation omitted). The Child Advocate should not be faulted for failing to challenge the Subpoena she never received and did not see until DOJ filed it publicly in Texas.

14

The government's timeliness argument is "disingenuous, given the patients' initial lack of awareness of, and uncertainty regarding, the subpoena." *In re: 2025 UPMC Subpoena*, 2025 WL 3724705, at *1.

Moreover, the government's timeliness argument is internally contradictory. It cannot simultaneously contend that § 3486(a)(5) is unavailable to the Child Advocate and that she is time-barred for failing to invoke § 3486(a)(5) by the return date in the statute. If the statute does not provide her a mechanism to challenge the Subpoena, as the government insists, then its deadline cannot bind her either.

Even if the return date deadline applied to the Child Advocate at all (which it does not), any untimeliness in the motion to quash should be excused. *See Michalski v. Little*, No. 1:22-CV-00262-SPB, 2025 U.S. Dist. LEXIS 144049, at *3 (W.D. Pa. July 28, 2025) ("district courts have broad discretion to consider untimely motions to quash where good cause or compelling reasons exist."); *Olszewski v. Bloomberg L.P.*, No. 96 Civ. 3393, 2000 WL 1843236, at *4 (S.D.N.Y. Dec. 13, 2000) (considering untimely motion to quash because movant was "entitled to protection from discovery of his confidential health and disciplinary records"). Even where a motion is untimely, courts routinely excuse timeliness issues when subpoenas are facially overbroad or implicate confidential health information. *See Hong Kong Brown Int'l Trade Co. v. FS Med. Supplies LLC*, No. 26 MC 104 (DEH), 2026 U.S. Dist. LEXIS 80745, at *9 (S.D.N.Y. Apr. 7, 2026) (overlooking an untimely motion to quash because "the overbroad nature of the subpoena, along with the protected nature of the information sought, justifies consideration of the motion's merits.")

In this case, the government's argument that the Child Advocate's motion reflected "nine months of tardiness," ECF No. 9 at 11, is particularly disingenuous given the government's own conduct in bringing an enforcement action. The government argues that after August 7, 2025, the return date for the Subpoena, no one would be able to move to quash the Subpoena, whether they knew it existed or not. *Id.* But the government itself did nothing to enforce the Subpoena during those nine months. Courts have found good cause to excuse otherwise untimely motions to quash where the subpoenaing party "failed to aggressively pursue the subpoena's enforcement within the delay period" and "raise[d] no claim of prejudice resulting from the delay." *In re DMCA Section 512(h) Subpoena to YouTube*, 581 F. Supp. 3d at 516-17.

In January and February 2026, as correspondence produced in the Northern District of Texas action makes clear, DOJ and RI Hospital were meeting and conferring about proposed search terms for review in anticipation of further document production in response to the Subpoena. *See In the Matter of Administrative Subpoena 25-1431-032*, No. 4:26-mc-00006-O, ECF No. 8 at 10 (N.D. Tex. May 6, 2026) (attached hereto as Exhibit 1). The fact that the parties were working to come to an agreement on the terms of document production covered by the Subpoena during that time would itself excuse any failure to meet that deadline. *See, e.g., Hartz Mt. Corp. v. Chanelle Pharm. Veterinary Prods. Mfg., Ltd.*, 235 F.R.D. 535, 536 (D. Me. 2006). Then, between February 4, 2026, and April 28, 2026, the government did not respond in any way to the search terms RI Hospital proposed. Ex. 1 at 10.

16

On Tuesday, April 28, 2026, the DOJ attorney engaged in the meet and confer with RI Hospital (who is based in Washington, D.C.) finally responded that he had "been out a few weeks" and asked to "conference this week [with RI Hospital] regarding status." Ex. 1 at 10. RI Hospital responded the next day that they were "happy to connect," and proposed to do so a few days later. *Id.* at 9. Incredibly, the response from DOJ, sent only one day later, did not address the government's own request for further conference, and instead responded: "No immediate need to connect now. I had hoped to talk before we filed the attached" copies of the filed motion to compel. *Id.* In other words, two days after the government requested to connect with RI Hospital "this week" about the status of its response to the Subpoena, after ignoring the Hospital's attempt to do so for months, DOJ raced to the courthouse in the Northern District of Texas to file a motion to compel in a forum that had no connection to the subpoenaed entity, the DOJ attorneys involved, the location of the records, or the place where the government directed the records to be produced. Therefore, the government cannot claim any prejudice from an allegedly untimely motion to quash. DOJ should not be rewarded for its tactics here. The Child Advocate acted immediately once the concrete threat to Rhode Island children became apparent.

## IV.    The Subpoena Was Issued for an Improper Purpose and in Bad Faith.

The government's contention that the Subpoena serves a legitimate investigative purpose has been rejected by seven federal court decisions evaluating identical subpoenas issued as part of the same nationwide campaign. Those courts rejected the same arguments the government makes here, and its opposition does not even attempt to engage with their reasoning. This Court should reach the same result.

17

The Court's review of an administrative subpoena is deferential, not ministerial. A subpoena must still be issued for a congressionally authorized purpose, seek information reasonably relevant to that lawful purpose, and not be used to harass, pressure, or pursue a collateral objective. *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022); *United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989); *United States v. Powell*, 379 U.S. 48, 57–58 (1964). The First Circuit has concluded that courts "have adequate justification to deny enforcement of [a] subpoena" when there is evidence it was issued in bad faith. *Comley*, 890 F.2d at 542. And the Supreme Court recently reaffirmed the "availability of federal court review on the back end" for administrative subpoenas to protect constitutional rights. *First Choice Women's Res. Centers*, 2026 WL 1153029, at *10.

The Child Advocate does not contend that DOJ must show probable cause or articulable suspicion. The point is narrower and dispositive: § 3486 authorizes subpoenas for federal healthcare criminal offenses. It does not authorize DOJ to conduct a roving investigation into a lawful medical practice because the President and the Attorney General disapprove of the care. Nor does it authorize DOJ to collect children's identities and medical histories first and look for a legal theory later.

The presumption of regularity does not foreclose judicial scrutiny, as DOJ suggests. It cannot serve as a substitute for the required showing that the subpoena serves a legitimate purpose and seeks information relevant to that purpose. *See*

18

*Mayor of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019). And the presumption is rebutted by the government's own repeated, unambiguous statements of its true purpose in issuing the Subpoena.

This case does not rest on stray political rhetoric or disagreement about policy. The government's extensive and repeated expression of its true and improper purpose in issuing these subpoenas is well documented in the Child Advocate's motion to quash. *See* ECF No. 1 at 8-13. That includes the government's explicit reaffirmation of its improper purpose after another court quashed an identical subpoena on the grounds that DOJ issued the subpoena not to investigate legal violations but instead to intimidate and coerce providers into abandoning lawful medical care: "As Attorney General Bondi has made clear, this Department of Justice will use every legal and law enforcement tool available to protect innocent children from being mutilated under the guise of 'care.'"[3]

Though the government's opposition attempts to recast some of the government's repeated statements of its true purpose as mere "policy opposition," it does not address or contest this plain statement of the true goal of the very subpoenas at issue here. Even accepting DOJ's preferred interpretation of each isolated statement it contests, the overall record shows a campaign directed at ending lawful medical care, not a tailored investigation of a cognizable federal healthcare offense. As the *QueerDoc*

---

[3] Josh Gerstein, *DOJ tried to subpoena an online trans health care provider. A judge quashed it*, Politico (Oct. 29, 2025), https://www.politico.com/news/2025/10/29/doj-subpoena-gender-affirming-care-ruling-00627891 (last visited May 1, 2026).

court concluded, "[n]o clearer evidence of improper purpose could exist than the government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303 (W.D. Wash. 2025).

This is not a mixed-purpose case in which a valid criminal investigation happens to touch a politically controversial subject. DOJ's asserted lawful predicates do not reach the conduct actually targeted by the subpoena and do not justify the records demanded. The subpoena's operative purpose is the one DOJ and the Administration repeatedly announced: ending lawful medical care for gender dysphoria. In any event, even crediting some legitimate interest, that interest would support at most narrowly tailored, non-patient-specific requests—not compelled disclosure of children's identities and medical records. The question is not whether one can imagine a legitimate purpose for the subpoena in the abstract; it is whether the government's *actual* purpose is legitimate on the facts before the court. It is not.

The Child Advocate does not argue that DOJ is disabled from investigating federal crimes because the subject is politically contested. Nor does she argue that lawful state-regulated conduct is immune from valid federal law. The Subpoena is unlawful because it was issued for harassment, pressure, and in bad faith. And DOJ has not identified a lawful federal predicate that fits the conduct actually targeted and the records actually demanded.

## V.    The FDCA Does Not Authorize This Investigation.

The government's purported FDCA justification has been thoroughly dismantled by multiple courts and fails for several independent reasons. First, the FDCA

does not prohibit physicians from prescribing FDA-approved drugs for off-label uses. *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 5 (1st Cir. 2019). To the contrary, the First Circuit has confirmed that "the FDCA expressly protects the 'authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease.'" *United States v. Facteau*, 89 F.4th 1, 13 (1st Cir. 2023) (quoting 21 U.S.C. § 396). Thus, the government's core theory—that a hospital violates the FDCA's misbranding provisions by prescribing FDA-approved drugs off-label—is not debatable. It is foreclosed. The FDCA "does not regulate the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

The government attempts to avoid that settled rule by arguing that RI Hospital and its clinicians are "causing distribution of misbranded drugs" because some medications are administered in a clinical setting. ECF No. 9 at 17. That theory proves too much. Hospitals, clinics, oncology units, surgical centers, and pediatric practices routinely purchase, store, dispense, administer, and explain FDA-approved medications for off-label uses. If DOJ's theory were correct, routine off-label care across pediatrics, oncology, psychiatry, and other fields would become potential strict-liability criminal conduct whenever a hospital administered an approved drug for an indication not listed on the FDA label. The FDCA does not produce that absurd result. *See United States v. Evers*, 643 F.2d 1043 (5th Cir. 1981).

21

DOJ's manufacturer-promotion argument does not support the subpoena either. If DOJ is investigating manufacturers, it may seek manufacturer communications, promotional materials, payments, contracts, speaker arrangements, and other non-patient-specific evidence. A lawful manufacturer-promotion theory cannot be used as a gateway to patient-level records that do not themselves show product labeling, commercial promotion, or manufacturer conduct. And using a Subpoena for "future investigative leads," ECF No. 9 at 15, is not a relevance theory; it is a fishing-expedition theory, particularly where the "leads" are children and parents whose identities Congress specifically recognized as sensitive through § 3486(e).

And even if it were true that the government had any legitimate objective in issuing the Subpoena, the information it actually sought is not relevant to that objective. The Fourth Amendment requires that an administrative subpoena "be disallowed if it is far too sweeping in its terms to be regarded as reasonable. . . . And the requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from engaging in arbitrary fishing expeditions and from selecting targets of investigation out of malice or an intent to harass." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *8 (D. Colo. Jan. 5, 2026) (cleaned up).

As other courts evaluating identical subpoenas have found, "[r]ather than limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling," the government used the subpoena to "create a drag-

22

net designed to sweep in all patient data related to any prescription of puberty block-ers or hormone therapy." *Id*. The ways that providers of medical care for gender dys-phoria "treated individual children and intimate clinical details shed no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the [FDCA] and Section 331," so it is not "relevant in purpose to an FDCA investigation." *Id.* at *8. There is a simple reason for that: the DOJ's purpose in issuing the Subpoena was not, in fact, to investigate any legitimate FDCA viola-tion. It was to end medical care for gender dysphoria altogether. Because that is an improper purpose, the Court should quash the Subpoena.

## VI.   The Government's Billing and Coding Requests Are Not Relevant to a Lawful FDCA Inquiry.

Section 3486 permits subpoenas for specified federal healthcare offenses. It does not authorize a general False Claims Act audit. DOJ has conceded in other liti-gation that its authority to issue § 3486 subpoenas is limited to FDCA investigations, not FCA violations. Yet the majority of the Subpoena's requests, for personnel files, billing codes, and patient records, relate to billing fraud theories that sound in the FCA, not the FDCA. This mismatch further confirms the pretext of the Subpoena. The government's billing theory, ECF No. 9 at 14-15, is especially weak in Rhode Island. Rhode Island has not banned this medical care for gender dysphoria; it af-firmatively protects it. Rhode Island Medicaid guidance covers treatment for gender dysphoria, including for patients age 17 and younger. DOJ cannot infer fraud from the fact that providers used diagnosis codes reflecting endocrine care in a state where the underlying care is lawful and covered.

Billing records would matter to felony FDCA liability only if there were first a viable FDCA violation and if the alleged intent to defraud or mislead were connected to that violation. *See United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir. 1991). DOJ has neither. Instead, it uses billing and coding allegations to backfill a legally deficient misbranding theory. And in any event, there is no basis for investigating false billing in Rhode Island, where medical care for gender dysphoria is lawful, protected, and covered by Medicaid. DOJ cannot plausibly infer that RI Hospital needed to disguise the care to evade a ban.

## VII.   The Privacy Harms Threatened to Rhode Island's Children Outweigh Any Legitimate Governmental Need.

As discussed above, the threat posed by the Subpoena to the constitutional privacy rights of Rhode Island's children is grave and imminent. Disclosure to DOJ is itself an irreparable injury where the government has publicly characterized the medical care at issue as "mutilation" and "child abuse" and has announced a goal of ending it. The risk is not limited to public dissemination. The injury includes compelled disclosure to hostile law-enforcement officials, use of records to identify families and children as leads, chilling future care, and undermining the physician-patient relationship. *Cf First Choice Women's Res. Centers, Inc*, 2026 WL 1153029, at *9-10 (finding a "plaintiff suffers ongoing injuries from the subpoena itself" when "[o]bjectively reasonable people interested both in their privacy and in associating with [the subpoenaed entity] would 'not lightly disregard' such a distinct possibility of disclosure.") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)).

DOJ's demand for identifying information is especially harmful because it appears specifically designed to permit investigators to approach patients and parents. For a child in this population, contact by federal agents about medical care DOJ has publicly demonized could inflict fear, guilt, shame, and acute mental-health harm, particularly if the child believes their statements may be used against a parent, guardian, foster parent, or treating provider. For children who have not publicly disclosed their gender identity or treatment history, investigative contact may also out them to family members, caregivers, schools, or communities. That harm exists even if the records are never leaked publicly.

General notice from RI Hospital that disclosure is legally possible as part of the Hospital's Privacy Practices also cannot waive constitutional rights and does not eliminate patients' reasonable expectation that such disclosure will occur only when legally proper. At most, such notices establish a reduced, not eliminated, expectation of privacy. *See Ricco Jonas*, 24 F.4th at 736. Patients reasonably expect that government access to their medical records requires lawful statutory authority and compliance with constitutional limits. A notice that records may be disclosed for lawful investigations does not authorize disclosure for unlawful or pretextual ones. *See Ferguson v. City of Charleston*, 532 U.S. 67, 78-79 (2001). The government's position would mean that anyone who signs a hospital privacy form forfeits all constitutional protection. No precedent supports that result. *See Carpenter v. United States*, 585 U.S. 296, 314 (2018) ("But the fact of 'diminished privacy interests does not mean that the

25

Fourth Amendment falls out of the picture entirely.'") (quoting *Riley v. California*, 573 U.S. 373, 392 (2014)).

Rhode Island law independently confirms the weight of the privacy interests at issue here. The Confidentiality of Health Care Communications and Information Act protects "confidential healthcare information," including information relating to a patient's diagnosis, condition, treatment, or evaluation, and separately protects information that identifies a patient explicitly or by implication. R.I. Gen. Laws § 5-37.3-3. In judicial proceedings, Rhode Island law requires notice to the person whose records are sought, affords the individual or authorized representative an opportunity to move to quash, and requires quashal unless the requesting party demonstrates both relevance and that the need for disclosure clearly outweighs the individual's privacy interest. R.I. Gen. Laws § 5-37.3-6.1.

The Child Advocate does not contend that Rhode Island law immunizes anyone from a valid federal investigation or a valid federal subpoena. Instead, Rhode Island law confirms the strength of the privacy interests, the reasonable expectations of Rhode Island patients, and the State's sovereign policy judgment that this care is lawful and protected. Section 3486(d)'s protection for good-faith compliance does not preempt federal constitutional review, does not validate an unlawful subpoena, and does not prevent this Court from considering Rhode Island's privacy and healthcare laws when balancing the injury to children, the physician-patient relationship, and treatment services. Rhode Island's laws do not displace federal law, but they are

26

highly relevant to the constitutional balance. They confirm that Rhode Island children reasonably expect their medical records will not be disclosed to law enforcement without notice, judicial scrutiny, and a showing that the need for disclosure clearly outweighs the privacy injury.

## VIII. Relief Should Not Be Limited to a Narrow Carveout that Fails to Protect DCYF Children.

The government argues that any relief should be confined to children in DCYF custody or care. But a subpoena "remains at all times under the control and supervision of a court," and courts possess inherent authority to quash subpoenas that are unlawful or unconstitutional. *In re Grand Jury Subpoena*, 829 F.2d at 1297. Limiting relief to identified children would leave similarly situated patients exposed to unconstitutional intrusion based solely on whether they have a statutory advocate. The constitutional and statutory defects in this Subpoena—improper purpose, lack of legitimate investigative basis, and disproportionate invasion of privacy—infect the Subpoena as a whole, not merely as applied to particular patients. Where a subpoena is issued for an improper purpose or exceeds statutory authority, quashal is the proper remedy: the UPMC court granted the motion to quash as to all patients, not only named movants, for precisely this reason. *See* 2025 WL 3724705, at *3.

Children in DCYF custody or care are embedded within the broader responsive patient population. Requiring RI Hospital to identify, segregate, and disclose which responsive records concern DCYF children would itself risk exposing the very children the Child Advocate seeks to protect. At minimum, if the Court is inclined to

27

tailor relief, it should bar production of all patient-identifying information and PHI for any patient who received care at RI Hospital.

Moreover, anonymization does not cure the constitutional harm. In *Northwestern Memorial Hospital v. Ashcroft*, the Seventh Circuit affirmed quashing a subpoena for redacted medical records because redaction could not eliminate realistic risks of reidentification and would not prevent harm, including the chilling effect on care-seeking. 362 F.3d 923, 929–31 (7th Cir. 2004). Those concerns apply with full force here. The records DOJ seeks do not merely contain names and diagnosis codes. They may contain details about a child's home, school, peers, family relationships, mental health, reproductive and sexual health, trauma history, gender identity, and treatment by other providers. Removing names, dates of birth, or Social Security numbers would not eliminate the realistic risk of reidentification, particularly for children in DCYF care whose placements, family circumstances, provider contacts, and clinical histories may be distinctive.

## CONCLUSION

The Subpoena does not satisfy governing constitutional and statutory requirements, was issued for an improper purpose in bad faith, and threatens irreparable harm to the constitutional privacy interests of Rhode Island's children. The Child Advocate respectfully requests that the Court quash the Subpoena in its entirety. In the alternative, the Court should modify the Subpoena and enter an order barring DOJ from receiving, using, retaining, or disseminating patient-identifying infor-

28

mation or protected health information, including all materials responsive to Requests 11 through 15, and any other materials that identify, or reasonably permit identification of, Rhode Island's children.

Dated:  May 8, 2026                                    Respectfully submitted,

                                                       */s/ Kevin Love Hubbard*
                                                       Miriam Weizenbaum (RI Bar No. 5182)
                                                       Kevin Love Hubbard (MA Bar No. 704772) *
                                                       Amy R. Romero (RI Bar No. 8262)
                                                       DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                                       199 North Main Street
                                                       Providence, RI 02903
                                                       (401) 453-1500
                                                       Miriam@dwbrlaw.com
                                                       Amy@dwbrlaw.com
                                                       Kevin@dwbrlaw.com
                                                       Cooperating Counsel,
                                                       Lawyers' Committee for RI

                                                       Lynette Labinger (RI Bar No. 1645)
                                                       128 Dorrance St., Box 710
                                                       Providence, RI 02903
                                                       (401) 465-9565
                                                       ll@labingerlaw.com
                                                       Cooperating Counsel, ACLU Foundation of RI

                                                       *Counsel for the Child Advocate*

                                                       * Admitted Pro Hac Vice

29

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, I electronically filed the within Reply and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kevin Love Hubbard*
Kevin Love Hubbard

30