# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA
25-1431-032

Case No. 4:26-mc-006-O

## GOVERNMENT'S RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR STAY PENDING APPEAL

Less than a week ago, but about ten months after the issuance of the subpoena in question, this Court ordered Rhode Island Hospital ("RIH") to comply with the subpoena. RIH now seeks a stay pending appeal. For the reasons described herein, RIH has not met its burden to demonstrate entitlement to the "extraordinary relief" of a stay, and its motion should be denied.

### BACKGROUND

On July 3, 2026, the Government issued a subpoena pursuant to its 18 U.S.C. § 3486 subpoena authority to RIH. Doc. 1-2. The subpoena's return date was August 7, 2025. *Id.* at 1. RIH did not move to quash the subpoena within the statutory deadline to do so. In fact, it engaged with the Government and represented to the Government that it would at least partially comply with the subpoena. However, over the ensuing roughly nine months, the Hospital produced one six-page document, and it never moved to quash.

On April 30, 2026—nearly ten months after the Hospital was served with the subpoena, and nearly nine months after a motion to quash was due under the statute, *see*

18 U.S.C. § 3486(a)(5)—the Government moved to enforce the subpoena in the in this Court, which is where this nationwide investigation is being carried on. 18 U.S.C. § 3486(c). That same day, this Court signed an order enforcing the subpoena. *In the Matter of Administrative Subpoena 25-1431-032* (N.D. Tex. 2026 Apr. 30, 2026) (Doc. 2 at 1). RIH appealed and moved this Court to stay its order.

## ARGUMENT

A stay pending appeal is "extraordinary relief" for which the movant bears a "heavy burden." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). In determining whether RIH has met its burden, the Court considers "four factors": "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies.'" *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024) (quoting *Nken v. Holder,* 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Id.* (quoting *Nken*, 556 U.S. at 434). But "[a] stay pending appeal 'is not a matter of right, even if irreparable injury might otherwise result.'" *Id.* (quoting *Nken*, 556 U.S. at 427).

### I.  RIH Is Unlikely to Prevail on Appeal

#### a. RIH's Procedural Argument Is Unlikely to Prevail

RIH first claims a likelihood of success on the merits because it did not receive "notice and an opportunity to respond before enforcement." Doc. 7 at 4–6 (quotation omitted). But this Court's procedure in enforcing the subpoena was proper, and RIH is

unlikely to prevail on appeal. An administrative subpoena enforcement proceeding is designed to be summary in nature and to employ flexible procedures to ensure a speedy resolution of the matter. "The great discretion afforded by motion rules is appropriate when regulating the form of opposition to subpoena enforcement because . . . subpoena enforcement is meant to be a summary proceeding." *EEOC v. Bay Shipbuilding Corp.*, 668 F.2d 304, 310 (7th Cir. 1981).

RIH asserts that a response from a nonmovant is *required* prior to a district court deciding a motion. But the Fifth Circuit has said the opposite. A "district court does not abuse its discretion or violate a non-movant's due process rights by deciding a motion to dismiss before the non-movant has responded if 'the response would [not] have affected the outcome of the decision.'" *Vodicka v. Ermatinger*, No. 3:19-CV-0056-B, 2022 WL 992600, at *10 (N.D. Tex. Apr. 1, 2022) (alteration adopted) (quoting *United States v. Rand*, 924 F.3d 140, 144–45 (5th Cir. 2019)). So too here. Even though a nonmovant is obviously permitted to *attempt* to surmount its "heavy burden" to resist an administrative subpoena, *United States v. Zadeh*, 820 F.3d 746, 757 (5th Cir. 2016), a district court need not wait for a response if the district court reasonably believes that the response will not change the outcome. *See Vodicka*, 2022 WL 992600 at *10.[1] In such a circumstance, the "central question" is "whether the response would have affected the outcome of the district court's decision." *Rand*, 924 F.3d at 145.

Here, given the fulsomeness of the Government's application for enforcement, the presumption of regularity afforded prosecutorial activity, *United States v. Armstrong*, 517

---

[1]    Moreover, with RIH's response now before it, the Court can and should make clear that it has considered and rejected RIH's arguments against enforcement.

U.S. 456, 464 (1996), RIH's long-term noncompliance with the instant subpoena, and the fact that Government made the Court aware of arguments made to other district courts that have misguidedly quashed nearly identical subpoenas, the Court could reasonably have determined that RIH's opposition would not have affected the outcome of its decision. As explained *infra*, the merits arguments RIH now offers are meritless and do not go to the facial validity or procedural adequacy of the subpoena. Instead, RIH improperly challenges the legal theories the Government might ultimately use in a criminal prosecution, as well as Executive Branch officials' statements about gender-related medical procedures performed on minors. These are not valid bases upon which a party may resist an administrative subpoena. Put simply, RIH's arguments would not have changed the outcome of this Court's decision.

RIH cites *Sandsend Financial Consultants, Ltd. v. Federal Home Loan Bank Board* for the proposition that the district court in that case "robb[ed]" the government of "its right to be heard" in opposition to a motion to quash. Doc. 7 at 4 (quoting 878 F.2d 875, 881 (5th Cir. 1989)). But *Sandsend* does not stand for the proposition that a nonmovant must be permitted a response in all administrative subpoena proceedings; in fact, the case involves a statute that *requires* the agency to respond to a motion to quash. *See* 878 F.2d at 881. Moreover, the Fifth Circuit has never said that subpoena enforcement proceedings are somehow exempted from the discretion afforded to district judges—recognized in *Rand*—to decide motions without responses in appropriate circumstances. And even in *Sandsend*, the Fifth Circuit did not "remand for reconsideration under the proper procedure." *Id.* Instead, because the record permitted "only one resolution" of the issue

4

on appeal, the Fifth Circuit decided against "wast[ing] precious resources remanding the case," and proceeded to reverse in order to uphold the subpoena's validity. *Id.* The record here, too, only permits one resolution—enforcement of the subpoena. *See infra* at 7–12. A stay is therefore unwarranted.

In sum, the Government filed a fulsome enforcement application nearly ten months after it issued a subpoena to RIH and nine months after RIH could have filed a motion to quash that subpoena in its home district. The Court reviewed the application, was aware of arguments against enforcement, and found that the Government met the requirements for summary enforcement. Nothing more was required to grant the Government's petition.

### b.  Venue Is Proper in This District

RIH is also unlikely to succeed on appeal in its venue argument. As described in the attached Declaration from the Acting Director of the Enforcement and Affirmative Litigation Branch, the "investigation is being carried on" in this district, and venue is therefore proper. *See generally* Hsiao Declaration (motion to file under seal and ex parte pending).

RIH's arguments to the contrary are factually and legally incorrect. First, as discussed in the Declaration, there is substantial operational and decision-making control of the investigation being exercised at the U.S. Attorney's Office in the Northern District of Texas, along with several subjects and potential targets of the investigation located here. Also as discussed in the Declaration, while the investigation is indeed nationwide in scope, the Government did not simply decide that it would park the investigation in this

5

District to bring enforcement petitions and nothing else. Rather, there are substantial investigative steps happening here.

Legally, RIH's venue arguments fare little better. RIH's case citations involve statutes authorizing civil investigative demands from various federal agencies that operate in a different way than the statute at issue here. *See* Doc. 7 at 7. Indeed, Section 3486 authorizes the *Attorney General* to issue subpoenas in support of *criminal* investigations and permits the Government to bring enforcement actions in "any court of the United States within the jurisdiction of which the [criminal] investigation is carried on." Criminal charges do not spring forth from Government agencies in Washington, D.C.; rather, our Constitution requires that serious criminal charges be presented to grand juries in one of the 94 federal judicial districts of the United States. Hence, cases that parse different statutes and try to determine whether federal agency administrative investigations— which might not require court filings at all, let alone presentments to a grand jury—are being conducted in some amorphous sense in Washington, D.C., are not particularly relevant.

Similarly, 18 U.S.C. § 3486(c) uses purposefully capacious language, stating that the enforcement action can be brought in "any" district where the investigation is being "carried on." This is inclusive, not exclusive, language, and RIH does not meaningfully engage with it. RIH essentially argues that, to interpret this language, this Court should determine the location of the "command center" (whatever that is) for the Government's investigation and/or the location of some Government personnel with whom RIH has interacted, and permit the Government to bring enforcement actions only in that place.

6

Doc. 7 at 7. But determining the location of the "command center" of the Government's investigation has nothing to do with the statute that Congress passed.

In sum, this investigation is being "carried on" in the Northern District of Texas. RIH's venue arguments are therefore contrary to both the facts and the law. RIH is unlikely to prevail on appeal on this issue.

### c.  The Subpoena Is Proper

RIH is also unlikely to prevail on appeal on its arguments about the lawfulness of the subpoena. RIH argues that the subpoena is "unlawful" because it claims that the Government is proceeding on a theory that "'off label use of puberty blockers and cross sex hormones' is 'a violation of the FDCA.'" Doc. 7 at 8. But that is not what the Government argued in its Petition, nor is it what the Government is doing here. *See* Doc. 1 at 3–4 (explaining that when a drug is distributed for an intended use not approved by FDA—a potential FDCA violation—and an insurance plan pays for that drug, the FDCA violation becomes a "federal health care offense" under 18 U.S.C. § 24 and therefore may be investigated through a HIPAA subpoena). The Government does not contend that the mere act of off-label prescribing by a physician constitutes an FDCA offense.

While the FDCA does not generally regulate the practice of medicine, federal health care law obviously does proscribe many practices directly related to the practice of medicine, such as: the unlawful dispensing of unapproved drugs, prescription medications, and controlled substances, 21 U.S.C. §§ 331(a), 841; the making of false statements in relation to claims to public and private insurance payors, 18 U.S.C. § 1035; fraud on patients and insurance payors, 18 U.S.C. § 1347; and many others. A white coat

does not confer immunity from such laws. RIH's suggestion that the federal government has no role in ensuring that medical practitioners obey federal law while practicing medicine is absurd. HIPAA expressly grants authority to issue subpoenas in investigating potential violations of federal healthcare laws, including the FDCA.

But the larger problem with these arguments is that they are not cognizable in a subpoena enforcement action. A subpoena recipient "may not avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit" and cannot raise "factual challenges based on a lack of statutory 'coverage'" of a recipient's activities. *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076–77 (9th Cir. 2001); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[A] subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996) ("[Q]uestions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings."). That principle dates back over 80 years to Supreme Court decisions rejecting efforts to contest subpoenas based on claims that the investigating agency lacked authority over the matter. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 213–14 (1946); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508–09 (1943).

That rule follows from the posture of such proceedings: "[s]ubpoena enforcement proceedings are designed to be summary in nature and an agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction." *Sturm*, 84 F.3d at 5 (citation and quotation omitted). Were it otherwise, every subpoena recipient

8

could seek to pre-litigate issues of potential liability or statutory coverage, which would

"stop much if not all of investigation in the public interest at the threshold of inquiry."

*Oklahoma Press*, 327 U.S. at 213. It is thus enough to say that "an administrative

subpoena is to be enforced unless agency authority is plainly lacking." *EEOC v. Federal*

*Express Corp.*, 558 F.3d 842, 851 n.3 (9th Cir. 2009).

In short, RIH's arguments sound in hypothesizing a possible Government

enforcement action and trying to explain why RIH believes it will be meritless. But such

arguments have no place in administrative subpoena enforcement proceedings. RIH's

protestations about its perception of the Government's view of the FDCA is precisely the

sort of argument based on statutory coverage that cannot be entertained at this stage.

RIH's position would immunize all conduct even tangentially related to off-label

prescribing from federal investigation, an incorrect and dangerous argument. FDA has not

found that these drugs are safe and effective to treat gender dysphoria or any other mental

disorder. Off-label use of drugs such as these can expose patients to unproven and

potentially dangerous treatments without adequate evidence of safety and effectiveness.

These risks are particularly acute where, as here, the patients involved are children, which

makes them especially vulnerable. As the comprehensive, peer-reviewed November 2025

HHS report explains:

> [I]n studies, PBs [puberty blockers] are followed by cross-sex
> hormones (CSH) over 90% of the time; this de facto combination
> therapy introduces new and potentially serious risks (e.g., concerning
> fertility) and has never been subjected to any FDA-regulated clinical
> trial for any population. Further, research shows that when the evidence
> supporting a particular off-label use is of very low certainty—as is the
> case for PMT [pediatric medical transition]—the already elevated risk
> of adverse effects associated with off-label use is increased even further.

U.S. DEP'T OF HEALTH & HUM. SERVS., TREATMENT FOR PEDIATRIC GENDER

DYSPHORIA: REVIEW OF EVIDENCE AND BEST PRACTICES 102 (Nov. 19, 2025) ("HHS

REVIEW"). Although off-label prescribing itself is a generally permitted practice under

federal law, "[t]he unfavorable risk/benefit profile distinguishes [puberty blockers and

cross-sex hormones for minors] from many other off-label uses of drugs and medical

devices." *Id.* at 231.

Moreover, the widespread off-label use of these powerful drugs also undermines the

regulatory system that Congress established to ensure that drugs are used consistent with

sound scientific data. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609,

619 (1973) (noting that legislative history for portions of FDCA "show a marked concern

that impressions or beliefs of physicians [regarding a drug's efficacy], no matter how

fervently held, are treacherous"). The FDCA rests on the premise that safety and efficacy

must be demonstrated through rigorous, publicly accountable testing, rather than assumed

based on clinical theory or intuition, or shaped by advocacy-driven ideology unrelated to

scientific rigor. *Cf.* HHS REVIEW, at 210–217 (finding that appearance of broad medical

consensus was largely manufactured through reliance on small committees aligned with

advocacy-based organizations such as World Professional Association for Transgender

Health (WPATH) and marked by suppression of dissenting views and discouragement of

scientific debate).

The subpoena here seeks information relevant to an FDCA investigation in two

respects. *First*, RIH may itself be engaged in conduct that implicates the FDCA, as the

Hsiao Declaration attached to the Government's initial Petition (Doc. 1-1) explains. There

is no basis to predetermine in a subpoena proceeding, as explained *supra*, without the benefit of any factual record, the potential scope of RIH's activities, and its relationship to the statute.

 *Second*, RIH may also have relevant information about the conduct of manufacturers and distributors of drugs that may have violated the FDCA. In particular, misbranding, via false or misleading "written, printed, or graphic matter" on a drug, container, or wrapper or that supplements, explains, or is designed for use with a drug, is a classic FDCA violation. *See, e.g.*, *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (upholding misbranding conviction of the defendant who shipped drugs with false informational sheets). Drug manufacturers and distributors also can be convicted of FDCA violations, for example, for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g.*, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008), Doc. 11 (conviction of manufacturer for promoting three drugs for off-label uses). Thus, in such prosecutions, the government may rely on evidence of communications between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses. *See, e.g.*, *Cephalon*, Doc. 1, ¶¶ 12–18 (criminal information); Press Release, U.S. Dep't of Just., *Eli Lilly and*

*Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005),

https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving

illegal off-label promotion, highlighting evidence that the defendant "[e]ncourag[ed] sales

representatives … to send unsolicited medical letters to promote the drug for an

unapproved use to doctors").

The subpoena here is plainly calculated to seek this same sort of evidence, including

(for example) materials from and communications with manufacturers and sales

representatives regarding the use of puberty blockers or hormones (Requests 7 through 9)

and evidence of manufacturers' financial incentives to prescribing physicians to prescribe

puberty blockers or hormones (Request 10). Similarly, billing codes and communications

with manufacturers or distributors about billing for off-label uses (Requests 3 through 6)

may produce evidence of intentionally misleading coding that could, in turn, be traced to

manufacturers or distributors attempting to conceal misbranding.

The initial Hsiao Declaration details precisely how and why each category of

information the subpoena seeks is relevant and necessary to further the Government's

investigation, including how physician prescribing practices are relevant. *See* Doc. 1-1 at

¶¶ 43–44. The requested records bear directly on whether the practices surrounding

distribution, promotion, and the sale of these drugs—unproven as safe and effective for

treating gender dysphoria or any other mental disorder—may be violating federal law and

endangering children. Such inquiries fall squarely within the Government's statutory

mandate to protect the public from misbranded, adulterated, and unapproved drugs. *See*

*United States v. Dotterweich*, 320 U.S. 277, 285 (1943) (FDCA protects the "innocent public who are wholly helpless" to protect themselves from such products).

## II. <u>RIH Will Not Suffer Irreparable Harm</u>

RIH's motion also fails on the second requirement, that it prove it will be irreparably harmed absent a stay. "[A] showing of irreparable harm is a necessary prerequisite for a stay," *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024), and RIH has not made such a showing. "The irreparable-harm analysis focuses on the *moving party*, not the nonmoving party or some third party." *Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis added).

RIH's assertions about irreparable harm are that responding to the subpoena will moot the case, that it will cost money to collect documents to respond to the subpoena, and that its relationships with its patients will be harmed absent a stay. Doc. 7 at 12–14. Even crediting the untested, general affidavits RIH offers, none of these things qualifies as cognizable irreparable harm.

First, producing documents to the Government is not irreparable harm and will not moot the case. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–15 (1992) (holding that still-available remedies prevent subpoena challenges from becoming moot after disclosure of documents in compliance with subpoena). The subpoena requires production of nonprivileged, pre-existing business records of a large, closely regulated healthcare provider. Accepting RIH's argument would mean that any time a court orders

compliance with a subpoena, the subpoenaed party would automatically be able to make a showing of irreparable harm. That is not and cannot be not the law.

Moreover, RIH has not explained how the Government seeing its nonprivileged business records as part of a lawful criminal investigation could possibly qualify as irreparable harm—the only consequence would be the Government investigating to see whether federal law was violated. In fact, even if there is "harm" from the Government seeing RIH's documents, that harm is eminently reparable: The Court can order complete return of the documents on any potential remand if RIH is successful on appeal, and the Court can order that no information gleaned from those documents be used in the investigation. That is an adequate remedy to address the concern. *See United States ex rel. Barko v. Halliburton Co.*, 4 F. Supp. 3d 162, 169 (D.D.C. 2014); *Church of Scientology*, 506 U.S. at 15 ("[T]his case is not moot because if the summons were improperly issued or enforced a court could order that the IRS' copies of the tapes be either returned or destroyed.").

Second, spending money to comply with the subpoena is not an irreparable harm to RIH because, among many other things, "[t]he burden of complying with a subpoena does not constitute irreparable injury." *Nikon Corp. v. GlobalFoundries U.S., Inc.*, No. 17-MC-80071, 2017 WL 4865549, at *2 (N.D. Cal. Oct. 26, 2017). "In general, the cost to businesses of complying with governmental subpoenas are normal costs of doing business which should be borne by the company." *Hurt v. Dime Sav. Bank*, 151 F.R.D. 30, 31 (E.D.N.Y. 1993). RIH is a large, highly-regulated healthcare provider, and its parent company owns multiple such hospitals; spending money to comply with Government

subpoenas is unremarkable and certainly not irreparable for such an institution. And that

purported harm is even less understandable here: RIH sat on the subpoena for ten months

and produced one document. Because RIH did not move to quash, it could or should have

been collecting, reviewing, and readying documents for production. Its failure to move to

quash or comply with the subpoena over the course of ten months cannot constitute

irreparable harm now. "[S]elf-inflicted harm is not irreparable." *Texas v. EPA*, 662 F.

Supp. 3d 739 (S.D. Tex. 2023); *see Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (no

irreparable harm where litigant "could have avoided this problem" by adopting a different

litigation strategy).

Finally, the disclosure of patient records to the Government does not constitute

irreparable harm to RIH's relationships with its patients. The Government understands

that patients would prefer to keep their medical records private—indeed, that was one of

the animating purposes of HIPAA, of which the administrative subpoena provision of the

statute is a key element. But it does not follow that patients' preference for privacy would

lead to irreparable harm to *RIH*, which is the only relevant inquiry. *Kansas*, 124 F.4th at

534.

First, this investigation is not—and has never been—an investigation of patients or

parents seeking treatment for gender dysphoria, and the subpoena statute at issue

generally forbids the Government from using patient medical records to investigate

patients. 18 U.S.C. § 3486(e). But more importantly, the Hospital's ubiquitous privacy

practices disclosure for patient treatment—a familiar feature in all modern healthcare

settings—discloses to all RIH patients that patient health information may be shared with

the Government in response to subpoenas for law-enforcement investigations, as well as numerous other types of disclosures. Lifespan Joint Privacy Notice at 7, available at https://www.brownhealth.org/sites/default/files/2021-07/EN-Joint-Privacy-Notice-English_2021.pdf. RIH does not mention this fact or even attempt to explain how it could be irreparably harmed by doing something that it disclosed to patients it could do and that it is legally obligated to do.

### III.    The Balance of Equities Does Not Favor RIH

Because RIH does not make an adequate showing on the first two factors, balancing the other factors is unnecessary. But even if the Court were convinced RIH made some sort of showing on either factor, that showing is outweighed by the Government's interest in enforcing the law and in continuing a lawful investigation that is a priority of the Executive Branch—and this is also the public's interest. "[I]n the context of a stay, assessing the harm to the opposing party and weighing the public interest merge when the Government is the opposing party." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The Government has an "uncontested interest" in the "faithful execution of law." *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025). Indeed, "[t]he government has a compelling interest in identifying illegal activity and in deterring future misconduct," and that interest "outweighs the privacy rights of those whose [medical] records" are sought via a properly issued HIPAA subpoena, "particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000); *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (reiterating the government's

"compelling interest in finding, convicting, and punishing those who violate the law" (citation omitted)).

In short, RIH producing nonprivileged business records to the Government as part of a lawful investigation into violations of federal law is not a harmful act at all, let alone one that would support the "extraordinary relief" of a stay pending appeal.

## CONCLUSION

This Court should deny the motion for a stay pending appeal.

Dated: this 8th day of May 2026.

Respectfully submitted,

RYAN RAYBOULD
United States Attorney

BRETT A. SHUMATE
Assistant Attorney General

ETHAN WOMBLE
Assistant United States Attorney

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

U.S. Attorney's Office
State Bar No. 24102757
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Fax: 214-659-8809
ethan.womble@usdoj.gov

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation
    Branch


 /s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
United States Department of Justice
Enforcement & Affirmative Litigation
    Branch
P.O. Box 386
Washington, DC 20044

Tel:  (202) 532-4723
Fax:  (202) 514-8742
Patrick.R.Runkle@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, I electronically filed this Opposition and it is

available for viewing and downloading from the Court's CM/ECF System, and the

participants in the case that are registered CM/ECF users will be served electronically by

the CM/ECF system.

 */s/ Patrick R. Runkle*
PATRICK R. RUNKLE
Assistant Director