# Exhibit 14-A

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-014** | MISCELLANEOUS ACTION NO. 25-MC-0039-MAK |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO CHILDREN'S HOSPITAL OF PHILADELPHIA'S MOTION TO MODIFY**

While the Government recognizes this investigation concerns potential misconduct undertaken in the context of a politically sensitive subject matter, that fact does not in any way make the subpoena's request for patient records—to which the Children's Hospital of Philadelphia ("CHOP") specifically objects—invalid or unenforceable. Because the statute that authorizes the administrative subpoenas in this case already strikes an appropriate privacy balance, CHOP's objections to producing patient records are meritless.

**BACKGROUND**

The Government is conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ("FDCA"). Because public or private insurance plans were presented with claims related to off-label use of these medications, such a violation of the FDCA could constitute a "federal health care offense" as defined by 18 U.S.C. § 24.

CHOP acknowledges that it provides gender-related medical care to minors, including the use of puberty blockers and cross-sex hormones that are one of the foci of the investigation. CHOP Memorandum ("Memo.") at 5-6. Puberty blockers are administered off-label for treating

gender dysphoria, and they are not authorized by FDA for that use. *United States v. Skrmetti*, 605 U.S. \_\_, 145 S. Ct. 1816, 1841 (June 18, 2025) (Thomas, J., concurring).

The instant subpoena to CHOP was duly issued on June 13, 2025, and was served on counsel for CHOP. The return date specified in the subpoena was set as July 9, 2025. CHOP has stated that it will comply with the other requests in the subpoena, but has refused to comply with the requests for patient information.

## ARGUMENT

Respectfully, the Court should deny CHOP's request to avoid compliance with the Government's subpoena. HIPAA authorized the Government to send HIPAA subpoenas in exactly this type of investigation and to obtain exactly the type of information this subpoena requests. CHOP's arguments to the contrary are either based on inapplicable law or reflect a fundamental misunderstanding of the interests at stake.

## I.  THE *WESTINGHOUSE* TEST DOES NOT APPLY TO THIS SUBPOENA.

CHOP's entire privacy argument rests exclusively on a novel application of *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, a 1980 Third Circuit decision. In that matter, the National Institute for Occupational Safety and Health ("NIOSH") issued a subpoena under its statute for medical records of Westinghouse employees whom NIOSH believed had been exposed to a dangerous substance. Westinghouse resisted the subpoena, and the Third Circuit conditionally ordered the records produced, fashioning a non-statutory seven-factor test not found in any Supreme Court precedent or prior decision. *Id*. at 579. The Court also fashioned a complex, non-statutory notice-and-response remedy as to medical records of individual employees not involved in the litigation. *Id*. at 581–82.

But the *Westinghouse* test does not apply to HIPAA subpoenas. Indeed, CHOP does not cite a single case applying the *Westinghouse* factors to a HIPAA subpoena, because it cannot, as

there is no case in this circuit or elsewhere applying *Westinghouse* to a HIPAA subpoena.[1] *Westinghouse* is simply inapposite, for two independent reasons:  First, the HIPAA statute—and the HIPAA subpoenas it created—superseded the *Westinghouse* test by addressing the concerns about medical privacy that animated the *Westinghouse* decision; and second, *Westinghouse* was wrongly decided.

### A.  The *Westinghouse* Test Does Not Apply to Medical Records Sought Via HIPAA Subpoena.

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") "is the primary federal law which was passed to ensure an individual's right to privacy over medical records." *United States v. Elliott*, 676 F. Supp. 2d. 431, 436 (D. Md. 2009). Congress created the type of administrative subpoena at issue here as part of HIPAA. Because HIPAA and HIPAA subpoenas did not exist in 1980, the issue of whether a HIPAA subpoena is subject to the *Westinghouse* test could not have been, and was not, decided by *Westinghouse*.

HIPAA sets forth a small number of basic procedural requirements for a HIPAA subpoena to be valid, and CHOP apparently believes those requirements are met here because it has agreed to produce non-patient-specific documents. 18 U.S.C. § 3486(a). Conspicuously absent from the statutory requirements for a HIPAA subpoena, however, is the seven-factor balancing test from *Westinghouse*. "If the text [of a statute] is clear and unambiguous, this Court must simply apply it." *In re KB Toys Inc.*, 736 F.3d 247, 251 (3d Cir. 2013). This Court should therefore hold that HIPAA subpoenas are not subject to the *Westinghouse* test.

---

[1]  In fact, the only case the Government is aware of in this circuit discussing a HIPAA subpoena makes no mention at all of *Westinghouse*, instead citing and quoting from the Sixth Circuit's decision in *Doe v. United States*, 253 F.3d 256 (6th Cir. 2001)—in which the Sixth Circuit affirmed the denial of a motion to quash a HIPAA subpoena—to explain that "it appears clear, both from the language of the statute and from Congress's intent in enacting HIPAA, that the DOJ's subpoena power in investigating federal health care offenses is meant to be broad" and that Section 3486's language "illustrat[es] the substantial scope of the subpoena power Congress intended to give the Attorney General." *United States v. Hertel & Brown Physical & Aquatic Therapy*, No. 1:21-CR-39, 2025 WL 83789, at *7 (W.D. Pa. Jan. 13, 2025).

By passing HIPAA in 1996, Congress directly addressed the privacy concerns that animated *Westinghouse* by generally prohibiting the disclosure of protected health information by covered entities. "Through HIPAA, Congress has spoken about the protection that must be extended to patients regarding their health related information." *Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 685 (W.D. Tenn. 2010). And in that same law, Congress in essence abrogated the *Westinghouse* test for HIPAA subpoenas by giving the Department of Justice a specific, Constitutionally-compliant subpoena power to obtain the very medical records that are protected by the HIPAA statute. Congress had medical privacy at the forefront of its mind, but it obviously did not believe that the *Westinghouse* factors—or anything like them—were warranted for HIPAA subpoenas or necessary to protect patient privacy. Put differently, a HIPPA subpoena that meets the statutory requirements for enforcement satisfy the *Westinghouse* test (and the Constitution's privacy guarantees) as a matter of law; no further balancing is required.

The only circuit courts to have considered HIPAA subpoenas have upheld them over Constitutional challenges that attempt to place privacy-based, *Westinghouse*-like additional restrictions on their use. *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[W]e reject [the subpoena recipient's] implied argument that the subpoena power as defined by 18 U.S.C. § 3486 is constitutionally unreasonable."); *Doe v. United States*, 253 F.3d 256, 264–65 (6th Cir. 2001) ("We agree with the Fourth Circuit that the reasonable relevance test should apply to [HIPAA] subpoenas."); *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012).

This is because, among other reasons, the Government's "compelling interest in identifying illegal activity and in deterring future misconduct" using a § 3486 subpoena outweighs Constitutional privacy concerns as a matter of law; the disclosure to the government of patient records is not "meaningfully distinguishable from a host of other unpleasant invasions of

-4-

privacy that are associated with many facets of health care." *In re Subpoena Duces Tecum*, 228 F.3d at 351. Furthermore, as these courts have also determined, HIPAA already provides Constitutionally reasonable privacy protection for patient information obtained via HIPAA subpoenas. *Id*. ("[The government's] interest outweighs the privacy rights of those whose records were turned over to the government, particularly in light of the limitation placed on uses of subpoenaed information by § 3486.").

Because the *Westinghouse* test does not apply, and because CHOP does not identify another source of law to resist complying with the Government's subpoena, this Court should deny CHOP's motion and order it to produce the requested documents.

## B. *Westinghouse* Was Wrongly Decided.

The Government recognizes that *Westinghouse* is a precedential decision of the Third Circuit, but wishes to preserve the argument that the case was wrongly decided should this Court decide that *Westinghouse* does apply in this context. Among other things, as described above, *Westinghouse* identified no actual basis in the statute or Supreme Court case law for the rule it articulated, erecting extra-statutory barriers to the enforcement of valid administrative subpoenas—as CHOP casually admits in its filing. *See* CHOP Memo. at 9 ("Even where a subpoena satisfies the criteria for judicial enforcement, a court must consider seven factors in determining whether an intrusion into an individual's privacy is justified.").

To the extent that *Westinghouse* purported to base its holding on an amorphous Constitutional right to the privacy of medical records, even the *Westinghouse* court recognized that the contours of such a right were unclear. 638 F.2d at 577. The Government is highly skeptical that an affirmative, free-floating right to control the disclosure of medical records in whatever context they may be found exists under current Constitutional jurisprudence, given the lack of historical grounding for such a right. *See Washington v. Glucksberg*, 521 U.S. 702, 722

(1997). The Government is also highly skeptical that CHOP has standing to raise a Fourth Amendment challenge to this subpoena on behalf of all its patients—perhaps this is why CHOP does not directly raise such a challenge, but only raises it indirectly through *Westinghouse*. *United States v. Miller*, 425 U.S. 435, 443 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

For these reasons, among others, the other circuits that have considered privacy-based challenges to administrative subpoenas have rejected such additional requirements. *In re Subpoena Duces Tecum*, 228 F.3d at 350; *Doe*, 253 F.3d at 264–65; *Whispering Oaks Residential Care Facility*, 673 F.3d at 817.

## II.     IN THE ALTERNATIVE, THE GOVERNMENT MEETS THE *WESTINGHOUSE* TEST.

The Court should also overrule CHOP's objections even if the *Westinghouse* test applies. The seven *Westinghouse* factors are: (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest favoring access. *Doe v. SEPTA*, 72 F.3d 1133, 1140 (3d Cir. 1995).

### A. "[T]he degree of need for access" (factor 6) and "whether there is an express statutory mandate" (factor 7) are essentially dispositive and strongly favor the Government.

Although CHOP acknowledges that factors 6 and 7 favor the Government, Memo. at 20-21 (putting these factors "on the other side of the ledger"), it gives short shrift to the proper interpretation and weight of these factors compared to the others. First, as to the government's

-6-

need for this information, the acts being investigated here are, at base, statutory violations commonly investigated by the Government in many contexts over many decades—such as violations of the Federal Food, Drug, and Cosmetic Act affecting the safety of the Nation's pharmaceutical supply, *see United States v. Dotterweich*, 320 U.S. 277, 280 (1943), and fraudulent practices in the healthcare system, *see Harkonen v. Sebelius*, No. C 13-0071 PJH, 2013 WL 5734918, at *16 (N.D. Cal. Oct. 22, 2013) (noting "the [G]overnment's interests in deterring fraud in the delivery of health care and health care items and services, and in protecting federal health care programs and their beneficiaries from individuals who have behaved in an untrustworthy manner"). The document requests here are common in such investigations, and CHOP does not really argue otherwise.

Next, as to CHOP's suggestion that the Government should settle for what CHOP is willing to provide, Memo. at 20, subpoena recipients do not typically get to choose what types of evidence the Government gets in its investigations. *In re Grand Jury*, 103 F.3d 1140, 1149 (3d Cir. 1997) ("the public has a right to every man's evidence"). CHOP does not offer the Court a compelling reason for the Court to authorize such an endeavor here. And the amount of secrecy in this area makes it difficult or impossible for the Government to investigate the on-the-ground provision of these services without obtaining the requested records.[2]

Finally, the Government's need under factor 6 is extremely heightened in this area, because—as discussed *supra* at 7–8—the investigation relates to potential misconduct committed against vulnerable children, leaving lifelong mental and physical side effects and consequences.

---

[2] For example, in denying an effort by WPATH, whose guidelines CHOP uses, to keep records of its guidelines' development from being publicly released, the Middle District of Alabama observed that WPATH "touts its guidelines and standards of care for treating transgender children as the product of rigorous science and broad consensus. Given this wide acceptance of what WPATH claims to be reliable evidence, one would think it would be willing and eager to demonstrate as much. It is not." *Boe v. Marshall*, 22-cv-184 (M.D. Ala.), (ECF No, 754, *Memorandum Opinion and Order Granting Time Sensitive Motion for Relief*, June 9, 2025.).

*See New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."); *In re Subpoena Duces Tecum*, 228 F.3d at 351 ("The government has a compelling interest in identifying illegal activity and in deterring future misconduct.").

In these circumstances, therefore, factor 6 is essentially dispositive. The Government's compelling interest in investigating health care offenses involving minors outweighs, as a matter of law, an individual's privacy interest in medical records. The Constitution cannot reasonably be interpreted to divest the Government of its ability to protect children and combat offenses committed against them.

Finally, even CHOP admits that factor 7 significantly favors the Government, because the statute "affords DOJ latitude," Memo. at 20, to undertake this investigation.[3] And that is an understatement. Congress enacted an express statutory mandate in HIPPA for DOJ to investigate the sort of offenses under investigation here—a mandate that "ranks with the other public interests which have been found to justify intrusion into records and information normally considered private." *Westinghouse*, 638 F.2d at 579.

**B. "[T]he adequacy of safeguards to prevent unauthorized disclosure" also favors the Government.**

As to factor 5, the circuit courts to have considered the privacy protections in the HIPAA subpoena statute have found them adequate to protect patient privacy. *In re Subpoena Duces Tecum*, 228 F.3d at 350; *Doe*, 253 F.3d at 264–65; *Whispering Oaks Residential Care Facility*, 673 F.3d at 817. Specifically, the statute requires the government to return records if the investigation does not ripen into an enforcement action. 18 U.S.C. § 3486(a)(8). More relevant to

---

[3]    CHOP mentions a vacated HHS regulation about reproductive healthcare in its footnote 15. It is unclear how a vacated regulation on what on its face appears to be a different subject matter assists CHOP in its motion.

CHOP's objections, the statute broadly prohibits the government from using or disclosing "health information about an individual" that is obtained via this subpoena, and it further generally prohibits the government from using protected health information about a patient against that patient. 18 U.S.C. § 3486(e).

CHOP misunderstands this factor by citing theoretical ways in which records obtained via HIPAA subpoena could be shared with, for example, state law-enforcement agencies under existing law. Memo. at 18. Factor 5, however, is focused only on "unauthorized disclosure," and disclosures permitted under the laws at issue would not be unauthorized. CHOP also cites statements of Executive Branch officials about disclosures of unrelated documents in other, unrelated investigations and subject matters to suggest that somehow patient records, in violation of the statute, will be leaked by unknown Government actors. *Id*. at 18–19. None of the statements CHOP cites even remotely indicate that the Government will not follow the HIPAA statute in this matter. *See United States v. Martinez*, 103 F. Supp. 3d 675, 678 (E.D. Pa. 2015) (collecting cases on judicial presumption that Executive Branch officials have "properly discharged their official duties").

Furthermore, CHOP does not consider other obvious ways that the records could be further protected, such as a protective order, a letter agreement with the Government, or an order placing the records under seal. In sum, this factor weighs in favor of production.

### C. "The type of record requested," "the information it does or might contain," and the "potential for harm in any subsequent nonconsensual disclosure" are outweighed by the need for the information.

The Government is skeptical that factors 1, 2, and 3 should be weighed as three separate factors. In this matter, as will almost always be the case, the three factors are essentially identical: the HIPAA subpoena requests sensitive health information about children, gender, and

-9-

sexuality (factor 1), the records do in fact likely contain sensitive information (factor 2), and—because the information is sensitive—disclosures could cause embarrassment or harm (factor 3).

The Government does not quibble with the sensitivity of the patient information involved in this subpoena. The disagreement is rather with CHOP's characterization and balancing of these three factors, which CHOP seems to believe are all but dispositive because of the controversies surrounding gender-related care for minors. But CHOP's lengthy and repeated invocations about the sensitivity of this information prove too much.

CHOP chooses to bankroll and run a specialty clinic that provides controversial pharmaceutical and surgical care for minors, and it is unclear how CHOP believes the Government can investigate violations of federal law in the context of "sensitive" areas of medicine—which are plentiful—without having the *Westinghouse* factors weighing strongly against it at the outset. The Government cannot investigate, for example, the provision of pharmaceuticals to minors without obtaining records of pharmaceuticals provided to minors.

Indeed, CHOP seems to believe that if a provider operates in a "sensitive" area of medicine, that medical provider should also operate in a zone of impunity where the Government is unable to subpoena the actual records of treatment of patients. That is plainly not the law: Plaintiffs can cite no constitutional provision, statute, or even case categorically exempting sensitive medical practices broadly from investigation. Indeed, those are precisely the sort of practices that are most likely to merit investigation.

Contrary to CHOP's suggestions, in this investigation, the sensitivity of the records actually militates in favor of disclosure, not against it—because the consequences to children of unlawful practices in gender-related care practices are potentially so severe. Justice Thomas' recent concurrence in *Skrmetti* lays out numerous concerning pieces of evidence suggesting that gender-related care for minors in the United States is rife with potential consumer-protection

violations: false statements made to induce patient and parental consent to off-label drug use and other life-altering procedures; powerful pharmaceuticals casually being given off-label to very young minors, causing lifelong side effects; purported treatment guidelines based on false or insufficient evidence; and other alarming trends that the Executive Branch could reasonably believe deserve exploration. *Skrmetti*, 145 S. Ct. at 1845-49.

Although CHOP tells the Court in a declaration that everything is fine at its clinic, the entire point of conducting an investigation is that the Government need not take CHOP's word that it is not violating federal law, and may use the subpoena power that Congress gave the Attorney General to determine the veracity of CHOP's representations. *United States v. Oncology Servs. Corp.*, 60 F.3d 1015, 1019 (3d Cir. 1995) (*citing United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950)) ("When investigative duties are delegated by statute to an agency, it may take steps to inform itself as to whether there is a probable violation of the law."). In sum, CHOP's showing on the first three *Westinghouse* factors is entirely outweighed by the need for the records and the Government's interest in preventing potential lifelong consequences to children. Furthermore, the Government is willing to work with CHOP to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise.

### D. "[T]he injury from disclosure to the relationship in which the record was generated" is at least neutral.

The fourth factor looks at the relationship between the patient and the entity that created the medical record. This factor is similar to the first three in that it will almost always militate against disclosure of patient records to the Government by providers—because a medical provider will always be able to say that its relationship with its patients will be affected by it

having to produce patient files to the Government.[4]  Similar to the lack of insight given by the first three factors, this means that in any case involving a sensitive area of medicine, the Government has four out of seven *Westinghouse* factors weighing against it before subpoena enforcement even begins. This would create an "exception" to HIPAA subpoena enforcement that would essentially swallow the rule. *EEOC v. Am. Exp. Centurion Bank*, 758 F. Supp. 217, 221 (D. Del. 1991) ("[T]he federal courts are and should be most cautious about interfering with the investigative power delegated by Congress to agencies[.]").

Although the Government does not doubt that the relationship between CHOP and its patients might be somehow affected by CHOP being investigated and thus having to provide its patients' medical records to the Government, there is no meaningful way to test this speculation. This assertion would also be true in nearly every health care investigation of any medical provider. The fourth factor should be weighed as neutral here, as it should in any Government investigation of a medical provider.

In sum, CHOP's potential showing on the first four factors—which are really just one factor—is clearly outweighed by the Government's need for patient records in order to investigate—pursuant to a statutory mandate—expressly prohibited potential misconduct in the healthcare field, in this case involving lifelong consequences to vulnerable minors. And if this issue still hangs in the balance—it should not—the statutory privacy protections resolve any doubt in the Government's favor. A conclusion to the contrary would hamstring the Government's ability to carry out its statutorily authorized mandate to investigate misconduct relating to healthcare.

---

[4]    The only realistic scenario in which factor four would not weigh against the Government is something like *Westinghouse* itself, where the record was created or held by an employer or some other non-medical entity.

**CONCLUSION**

For the reasons explained above, the United States respectfully requests that the Court deny CHOP's motion in its entirety. The government stands ready and willing to meet and confer with the hospital about practical ways to mitigate its concerns about patient privacy.

Dated this 4th day of August, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

SARMAD KHOJASTEH
Senior Counsel
Civil Division

LISA K. HSIAO
Acting Director


 /s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Tel:    202-532-4723
Fax:    202-514-8742
patrick.r.runkle@usdoj.gov

-14-

**CERTIFICATE OF SERVICE**

I hereby certify that I caused this document to be filed electronically with the Court's

CM/ECF system and is available for viewing and downloading from the CM/ECF system; the

CM/ECF system will serve it on all counsel of record by operation of the CM/ECF system this

4th day of August, 2025.

*/s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN

# Exhibit 14-B

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: 2025 UPMC SUBPOENA** | MISCELLANEOUS ACTION |
| | Case No. 2:25-mc-1069-CB |

### GOVERNMENT'S SUPPLEMENTAL BRIEF

The United States submits this supplemental brief pursuant to the Court's order of December 24, 2025. ECF 52. Respectfully, the plaintiffs now lack Article III standing, which means the Court now lacks jurisdiction. Accordingly, the Court should dismiss this action, thereby allowing UPMC to produce to the Government de-identified information that does not impinge in any way on plaintiffs' privacy interests. Even if the action is not fully moot, the application of the *Westinghouse* factors as to de-identified records now weighs strongly in favor of the Government. Hence, the Court should make clear in its order dismissing this action that UPMC is permitted to comply with all specifications of the subpoena in full as long as all patient information provided is de-identified pursuant to HIPAA's de-identification procedures.

### BACKGROUND

UPMC has not filed a motion to quash the instant subpoena, and the anonymous plaintiffs in this matter sought relief only as to patient identities, health information, and records. Prior to plaintiffs filing suit, the Government conferred with UPMC counsel and agreed that the Government would accept de-identified patient records in a first wave of productions, with the parties delaying until after such data was produced the question of whether any unredacted data would be produced. UPMC had not yet produced any identified or de-identified patient records

or information prior to plaintiffs filing suit and have not produced any such material since due to the pendency of this action. ECF 40-1.

On December 15, 2025, the Government revised its agreement with UPMC counsel so that the subpoena would be fully satisfied by production of only de-identified records, so that no individual patient could be identified to the Government. ECF 47. The Government made this concession in part to address the privacy concerns that animated plaintiffs' lawsuit. *Id*.; *see* ECF 2 at 8 (citing the government's "intrusion into [patients'] privacy"). The Government has also promised to inform the plaintiffs if the Government issues another HIPAA subpoena seeking patient records to UPMC, which the Government has no current plans to do. ECF 47. The Government informed the Court on December 16 of its withdrawal of the requests for identified patient information. *Id*.

On December 24, 2025, the Court issued an order quashing requests 11-13 as to unredacted records and finding standing on a "zone of interests" theory. ECF 52. The Court also granted the Government's Motion to Allow Supplemental Briefing and invited the parties to provide additional briefing on the question of de-identified patient records, "as envisioned in the government's Motion (Doc. 47) to supplement." *Id*. In a conference after the Court's December 24 order, UPMC counsel and the Government discussed the de-identification of material that could be produced pursuant to the outstanding requests in the subpoena. UPMC promised to de-identify any material provided to the Government, and that it would follow the specific HIPAA regulations that govern how a medical provider should de-identify patient records so that dissemination of such records would not implicate HIPAA privacy provisions.

**ARGUMENT**

### 1. <u>The Plaintiffs Lack Standing and the Suit Is Moot</u>

The agreement between UPMC and the Government concerning the production of de-identified patient records deprives plaintiffs of any Article III standing they may have had, and this lawsuit should be dismissed as moot.

"It is axiomatic that standing to sue is a prerequisite to Article III jurisdiction." *Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010). The constitutional requirement of standing requires that a plaintiff have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The plaintiff "bears the burden of establishing these elements." *Id*. "An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009).

Article III "requires that a plaintiff's claim be live not just when he first brings the suit but throughout the entire litigation." *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992); *see Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("[T]hroughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." (quotation omitted)).   A case is moot when "there is no longer a live controversy." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020).  "For a case to be moot in the Article III sense, all plaintiffs who once had Article III standing must have lost it, and none of the recognized exceptions to mootness"—as relevant here, voluntary cessation and conduct capable of repetition yet evading review—"can apply." *Gulden v. Exxon Mobil Corp.*, 119 F.4th 299, 305 (3d Cir. 2024).  Plaintiffs no longer have

standing and neither exception to mootness applies, meaning that this case is no longer justiciable.

### A. Plaintiffs Lack Standing

The Government's agreement with UPMC deprives plaintiffs of standing.  The de-identification of medical records has legal significance; the vast weight of authority recognizes that patients do not have legally cognizable privacy interests in de-identified medical records.  *In re NHL Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 955 (D. Minn. 2015) ("Once the identifying information is removed from the record, the patient's privacy interest is essentially eliminated.") (collecting cases); *United States ex rel. Roberts v. QHG of Ind., Inc.*, 1998 U.S. Dist. LEXIS 23512, at *29-30 (N.D. Ind. Oct. 8, 1998) ("[T]he privacy interests of a patient in his or her medical records is tied to identity information contained in the records").

HIPAA regulations and HHS guidance describe in extreme detail what information must be redacted before a medical record can be shared without violating HIPAA.  *See* 45 C.F.R. § 164.502(d); HHS OCR, "Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with [HIPAA]" (Nov. 26, 2012) (attached as Ex. A). Veteran counsel for UPMC—who has extensive experience in healthcare investigations—has represented that UPMC will diligently perform this de-identification.[1]

The plaintiffs' privacy interest in a *de-identified* medical record is—by definition—not "concrete and particularized." *See Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009).  Because the record is de-identified under the relevant HIPAA regulation and could legally—after de-

---

[1] The States' assertions in their amicus brief (filed today) that patient records cannot actually be de-identified is belied by federal law, 45 C.F.R. § 164.502(d), and by the rigorous methods discussed in Exhibit A.  The States also base this argument on facially incorrect and fact-free assertions that the Government is asking for a simple redaction of "name, address, [and] Social Security number."  ECF 55-1 at 13.

identification—be shared with *anyone*, there is no cognizable injury.  *See* Ex. A at 29 ("The Privacy Rule does not limit how a covered entity may disclose information that has been de-identified.").  There is also no way for any third party to reliably identify whether a concrete or particularized injury has even occurred, and the plaintiffs' claims therefore become a "generalized grievance" about the fact that a de-identified record somewhere, possibly related to them, has been disclosed to someone who is unable to determine to whom the record relates.  *See Carney v. Adams*, 592 U.S. 53, 60 (2020) (recognizing that a "generalized grievance" is insufficient for purposes of Article III standing).  This is simply insufficient as a matter of law to support standing because it is not recognized by the law as a cognizable privacy interest. [2] *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 180 (3d Cir. 2005) ("The cases in which a disclosure-based privacy violation has been found involve situations where there was either actual identification or the disclosure of identifying information such as would allow the individual to be identified and ultimately connected to his or her private information."); *Dinerstein v. Google, LLC*, 73 F.4th 502, 513 (7th Cir. 2023) (discussing modern Article III jurisprudence and stating that "the dissemination of anonymized [medical] information" likely did not "give rise to any injury at all—let alone one concrete enough to support Article III standing").

---

[2] *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004), is not to the contrary. First, that case does not present the standing question here because the subpoena recipient hospital there challenged the trial subpoena at issue and clearly had standing to do so. Second, Judge Posner apparently mistook what de-identifying a medical record entails, because the example he gave—of a photograph of a naked patient—would not pass the HIPAA de-identification test.  Ex. A at 8 (requiring removal of "full-face photographs and any comparable images").  Finally, the irony of plaintiffs citing *Northwestern Memorial Hospital* would be that Judge Posner stated in dicta that HIPAA subpoenas appear to "override the HIPAA regulations," meaning that Judge Posner believed the Government would have been able to obtain the challenged records in that case via the exact type of subpoena at issue here.  362 F.3d at 925.

Furthermore, the harm from the disclosure of a de-identified record is entirely conjectural and hypothetical, because a de-identified record does not invade any specific patient's zone of privacy, and a generalized preference that a de-identified record not be produced is simply not enough to support standing. If anyone who prefers that a document that is meaningful to them in the hands of a third party not be produced to the Government has standing to sue the Government to prevent disclosure, virtually any law enforcement subpoena could be easily overcome. That is simply not what black-letter law says about administrative subpoenas, which are supposed to allow broad disclosure akin to a grand jury subpoena. *In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973) ("[A]n administrative subpoena and a grand jury subpoena perform[] essentially the same function[.]"). And as the Fourth Circuit has noted in a case involving a HIPAA subpoena like the one at issue here, the disclosure of some amount of patient information is simply part of our modern system of medicine for multiple reasons, including the fact that (as here) patients apparently agreed to have their medical records released to insurance companies and others.[3] *United States v. Bailey (In re Subpoena Duces Tecum)*, 228 F.3d 341, 351 (4th Cir. 2000); Ex. B.

Just as plaintiffs have proceeded anonymously in this Court to protect their privacy, their privacy interests are similarly safeguarded by the Government's concession that it will not obtain any identifying health information of any patients at UPMC pursuant to this subpoena, let alone any PHI of the four anonymous plaintiffs. Because nothing produced under the subpoena will implicate any patients' specific privacy interest, the anonymous plaintiffs lack an injury-in-fact

---

[3] UPMC documents suggest that UPMC patients—which would include plaintiffs—understand and consent in some form to their *identified* medical records being shared with, among others, the Government via a subpoena—as well as with a list of about a dozen other types of entities. *See* Notice of Privacy Practices (Ex. B); Patient Agreement (Ex. C).

sufficient to support standing to file a suit against the United States and to challenge a duly authorized subpoena that the subpoena recipient itself has not challenged. Lastly, to the extent that plaintiffs claim that even de-identified patient records could somehow nevertheless betray their identity due to the nature of the treatment provided, such "argument rests on [] highly speculative fear" that "does not satisfy the requirement that threatened injury must be certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

### B.  The Case Is Moot

"In light of [plaintiffs'] current lack of Article III standing, this case is moot [because] no exception to a dismissal on mootness grounds applies." *Gulden*, 119 F.4th at 308.  There are two possible exceptions to dismissal: voluntary-cessation and capable-of-repetition-yet-evading-review. The voluntary-cessation exception ensures that a defendant is unable to "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024).  The exception does not apply here because, under the agreement with UPMC, the Government does not "remain[] 'free to return to [its] old ways.'" *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).  In other words, because UPMC will provide only de-identified documents, the Government's "challenged conduct" will not, and cannot, resume "as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012). The Government has no "plan[s] to reinstate" its request for identified patient records in the future and cannot "reasonably be expected to engage in the challenged behavior again." *Hartnett*, 963 F.3d at 306; *see Fikre*, 601 U.S. at 241 ("[O]ur precedents hold [that] a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be

-7-

expected to recur." (quotation omitted)).  Therefore, the voluntary-cessation exception does not apply.

The "capable-of-repetition-yet-evading-review exception does not apply here either." *Gulden*, 119 F.4th at 309.  This is because there is no "reasonable expectation" or "demonstrated probability" that the "*same* controversy will recur involving the *same* complaining party."  *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality.").  Because of the Government's agreement with UPMC, among other things, the four anonymous plaintiffs cannot demonstrate that the Government will again seek their identifying information via a HIPAA subpoena.  This is not an "exceptional" situation; the exception does not apply.

Because of the agreement to accept de-identified records and information deprived plaintiffs of any Article III standing they may have had, this case was moot before the Court entered its prior order.  The Court should therefore vacate its prior order and dismiss the case for lack of jurisdiction.

**2. <u>These Plaintiffs Do Not Have Standing to Assert the Rights of Other Patients or Seek Full Quashal</u>**

To the extent the Court finds that this case is not moot or performs a *Westinghouse* balancing test in any forthcoming order, the Court should limit such relief to the four plaintiffs in this action.  Although this issue was in the Government's opening brief, the Court did not address it in the December 24 order.  However, the agreement with UPMC further cements what was already clear: these four anonymous plaintiffs—to the extent they have standing to do anything at all—do not have standing to prevent UPMC from disclosing *other patients'* de-identified

-8-

records.  *California v. Texas*, 593 U.S. 659, 672 (2021) (stating that remedies "operate with respect to specific parties"); *Curry v. United States*, 192 F.2d 571, 572 (5th Cir. 1951) ("[A plaintiff] can not vicariously assert the constitutional rights of others who do not complain."). Even accepting the incorrect notion that these four patients could somehow assert the legal rights of hundreds or thousands of other patients as to unredacted records, that right becomes nonsensical when applied to de-identified records of other patients that could legally be shared with anyone.

Also, even if the Court concludes the case remains justiciable, it should, at the least, limit the scope of its order to identified patient records.  This is only relief necessary to redress the stated privacy injury, and federal courts are powerless to provide anything more.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").  To the extent that the plaintiffs contend UPMC could make redaction mistakes while de-identifying their records, the Government's proposed order allows UPMC to share the de-identified records of the four plaintiffs privately with those patients in a reasonable, time-limited procedure where they can identify any redaction concerns prior to the records being turned over to the Government.

3. **Even if Plaintiffs Have Marginal Standing, the *Westinghouse* Test Now Strongly Favors the Government**

Should the Court still determine that these four plaintiffs do have standing as to their own de-identified medical records, their *Westinghouse*-based arguments now fall flat, and the Court should require the production of de-identified records and information.  First, even accepting the incorrect idea that *Westinghouse* applies to the Government's original HIPAA subpoena issued pursuant to 18 U.S.C. § 3486—a statute that Congress passed 16 years after *Westinghouse* to allow the Government to obtain medical records in order to investigate federal healthcare

offenses, as it is attempting to do here—*Westinghouse* should not apply at all to a request for de-identified patient records, because a de-identified record does not raise any of the privacy concerns that animated *Westinghouse* in the first place.

Moreover, this Court is not writing on a blank slate here, because the Third Circuit, in a published opinion, has already rejected a *Westinghouse*-based privacy challenge to the disclosure of very sensitive but anonymized information related to minors.  In *C.N. v. Ridgewood Board. of Education*, a school district asked high-school students to take an anonymous survey on sensitive topics such as drug use and sexual activity, and then released the results of the survey to the public.  430 F.3d at 161-64.  Parents sued under a number of constitutional and federal statutory privacy theories.  *Id.*  Applying *Westinghouse* balancing, the Third Circuit rejected the challenges to the release of the information and found that the effective anonymization of the survey responses lessened the plaintiff's showing on "the privacy side of the balance"—which the court described as "the first five factors" of the *Westinghouse* test—to the extent that the disclosure was permissible under *Westinghouse*.  *Id*. at 180-82.  So too here.

The seven *Westinghouse* factors are: (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest favoring access.  *Doe v. SEPTA*, 72 F.3d 1133, 1140 (3d Cir. 1995).

Under the first three *Westinghouse* factors, and as described in an analogous situation in the district court opinion that the Third Circuit affirmed in *C.N.*, the nature of a de-identified medical record is simply not the same as an unredacted record and does not raise the same

privacy concerns. *C.N. v. Ridgewood Bd. of Educ.*, 319 F. Supp. 2d 483, 495 (D.N.J. 2004) ("[A]s already discussed there was no actual disclosure, at least in such a form that could produce harm in an individual."). The overwhelming weight of authority recognizes that patients' privacy interests are tied to personally identifiable information contained in medical records—which renders factors one, two, and three strongly to favor the Government.

Specifically on factor one, the "type of record" now requested is a fully de-identified record over which numerous courts have recognized there are no patient privacy interests at all and that can be shared with anyone. On factor two, the information the record might contain is de-identified medical procedure documentation that cannot be traced to an individual patient. As to factor three, the HIPAA regulations themselves—through requiring providers to redact the exact same personal information that will be redacted here—reflect that the disclosure of de-identified medical records do not cause the type of privacy harm that *Westinghouse* recognized.

On factor four, which is the harm to the relationship between the patients and UPMC, there are three facts that favor the Government despite the patients' anticipated concerns about disclosure. First, UPMC has ceased providing puberty-blocker medications, cross-sex hormones, and surgeries for minors with gender dysphoria, meaning that there will be no harm to any ongoing relationship between the patients and UPMC related to the care at issue. Second, UPMC patients apparently agreed that UPMC could share medical records in response to subpoenas, as noted above and in the attached Exhibits. And third, due to the fact that de-identified medical records have no HIPAA protection and there is no legal impediment to sharing them, also as described above, the patients' subjective concerns about their relationship with UPMC providers are not objectively reasonable—because de-identified medical records are

shared by healthcare providers on a regular basis for a variety of purposes. *Bailey*, 228 F.3d 341 at 351.

Factor five, which is the risk of "inadvertent disclosure," also strongly weighs in favor of the government here, because after a HIPAA-compliant redaction to a patient record, UPMC would be legally permitted to disclose the de-identified record without any HIPAA constraints. It is hard to understand how the Government—which is under a legal obligation to maintain the privacy of the patient information it obtains via these subpoenas, 18 U.S.C. § 3486(e)—could be faulted for the theoretical possibility of a leak when the record could be publicly disclosed without running afoul of the law.

On factor six, which considers "the need for access," this subpoena was issued as part of an investigation into *health care providers* and *pharmaceutical companies* promoting and getting paid for controversial, potentially life-altering *drugs* and *surgeries*—care that has been banned or curtailed in multiple Western European countries as ineffective and potentially harmful. The Government simply cannot investigate whether an expensive, name-brand, FDA-regulated pharmaceutical was misbranded when delivered to a patient—which can happen, among other things, when the drug is promoted by a pharmaceutical company for an off-label use—without looking at the circumstances under which the expensive, name-brand, FDA-regulated pharmaceutical was delivered to the patient. The idea that the federal government is not permitted to investigate what happened to (anonymous) patients who received adulterated or misbranded FDA-regulated pharmaceuticals—simply because there is sustained political opposition to this investigation—is incorrect. The Government has a need for these materials to continue a lawful investigation that has been ordered by the Attorney General of the United States. And finally, on factor seven, the subpoena was issued pursuant to an express statutory

mandate allowing such healthcare investigations, as described in the Government's opening brief.

## CONCLUSION

Because this action is now moot, the Court should dismiss it for lack of jurisdiction.  In its dismissal order, the Court should make clear that UPMC is permitted to comply with all specifications of the subpoena in full as long as all patient information provided is de-identified pursuant to the relevant HIPAA de-identification procedures.

Dated this 16th day of January, 2026.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT SHUMATE
Assistant Attorney General
JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 */s/ Patrick R. Runkle*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:    202-532-4723
Fax:    202-514-8742
patrick.r.runkle@usdoj.gov

-13-

-14-

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I served the foregoing Supplemental Brief via ECF to counsel of record.

Dated this 16th day of January 2026.

/s/ Patrick Runkle
PATRICK RUNKLE

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **IN RE: 2025 UPMC SUBPOENA** | MISCELLANEOUS ACTION<br><br>Case No. 2:25-mc-1069-CB |

**PROPOSED ORDER**

Whereas the Government has agreed with UPMC counsel that the subpoena will be fully satisfied by production of only de-identified records, so that no individual patient will be identified to the Government;

Whereas the Government has committed to inform the plaintiffs if it seeks to obtain their unredacted medical records via another HIPAA subpoena;

Whereas the Court recognizes that UPMC will allow the plaintiffs, if they so choose, to see the de-identified versions of their own medical records (and any other documents that have been de-identified that mention the plaintiffs) at least 14 days prior to UPMC turning those documents over to the Government, and will reasonably address any concerns about the de-identification of the plaintiffs' records.

Based on these recitations, the Court finds that this action is now moot and DISMISSES it without prejudice for lack of jurisdiction. The Court therefore VACATES its prior order entered on December 24, 2025. UPMC is permitted to comply with all specifications of the subpoena in full, and the subpoena is MODIFIED based on the Government's agreement with UPMC so that all patient-related information provided pursuant to this subpoena is fully de-identified pursuant to the relevant HIPAA de-identification procedures.

-2-

Dated:

_____
HONORABLE CATHY BISSOON
Chief United States District Judge

# Exhibit 14-C

*In Re 2025 Children's Hospital of Los Angeles Subpoena*

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into between Moving Parties Parents AA, BB1, BB2, CC, DD, and EE and Legal Guardian FF (collectively, "Moving Parties") and Respondent United States of America ("United States" or the "Government"), parties to *In Re 2025 Children's Hospital of Los Angeles Subpoena,* No. 2:25-cv-11183-MWC-JDE (C.D. Cal.) ("the Action").

## RECITALS

1.      On or around June 11, 2025, the Government issued a Subpoena to Children's Hospital of Los Angeles demanding the production of documents related to the provision of gender-related care for patients under the age of 18. A true and correct copy of the Subpoena is attached as Exhibit A.

2.      Among the items sought by the Government in the subpoena were the following:

**Request 11:** "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

**Request 12:** "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

**Request 13:** "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."

3.      The Subpoena also contained requests for items that could contain patient-identifying information, including the following:

**Request 2:** "All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (i.e., International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care."

**Request 4:** "All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD Codes."

**Request 15:** "All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care."

4.      The Government has represented that the purpose of the Subpoena is to investigate potential incidents of violations of the Food, Drug, and Cosmetic Act (FDCA) and related offenses. DOJ is not currently aware of information that would support the federal prosecution of parents or guardians who have sought and consented to receiving gender-related care for their children at Children's Hospital of Los Angeles.

5.      On November 21, 2025, Moving Parties, as parents and legal guardians of former patients at Children's Hospital Los Angeles's Center for Transyouth Health and Development, filed a Motion to Quash Administrative Subpoena, Motion to Proceed Under Pseudonym, and Motion for Class Certification and Appointment of Class Counsel.

6.      On December 8, 2025, the Government instructed Children's Hospital of Los Angeles—and Children's Hospital of Los Angeles agreed—to redact any patient identifying information in records that are produced in response to the Subpoena, and withdrew Subpoena Requests 11, 12, and 13 in their entirety. A true and correct copy of the withdrawal is attached as Exhibit B.

7.      As of the date of this Agreement, the Government has not received any document from Children's Hospital Los Angeles in response to Requests 11, 12, and 13, and further, the Government has not received any document from Children's Hospital Los Angeles in response to the Subpoena that contains patient identifying information.

8.      As of the date of this Agreement, the Government has not issued another subpoena to Children's Hospital Los Angeles or its related entities for records involving patient identifying information such as those described in Requests 11, 12, and 13 and does not currently plan to do so.

9.      The Parties now desire to settle Moving Parties' Motion to Quash Administrative Subpoena, Motion to Proceed Under Pseudonym, and Motion for Class Certification and Appointment of Class Counsel.

## AGREEMENT

In consideration of the Recitals above, the Parties agree as follows:

A.      **Patient identifying information** means all individually identifiable health information as defined in the HIPAA Privacy Rule, 45 C.F.R. § 160.103:

Information that is a subset of health information, including demographic information collected from an individual and:

(1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

B.      **Redaction** means removing patient identifying information or replacing patient identifying information with a unique code.

C.      At a minimum, the Government shall require Children's Hospital of Los Angeles to redact the following patient identifying information from records produced in response to the Subpoena, following the HIPAA Privacy Rule, 45 C.F.R. § 164.514(b)(2)(i):

1. The following identifiers of the individual or of relatives, employers, or household members of the individual:
   (A)    Names;

(B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

  (1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

  (2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000;

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except when the hospital assigns a code or other means of record identification to allow information de-identified to be re-identified by the hospital, provided that this process follows de-identification requirements under 45 C.F.R. § 164.514(c)

D.     If the Government receives a document in response to the Subpoena that contains patient identifying information, the Government shall make

all reasonable efforts to ensure it does not have access to the document thereafter, including by returning the document to Children's Hospital of Los Angeles or destroying the document in a secure manner. The Government will not use this patient identifying information to support any investigation or prosecution.

E.    If the Government receives patient identifying information from Children's Hospital of Los Angeles in response to the Subpoena, the Government shall, within three (3) calendar days of learning of the receipt of this information, inform Moving Parties' counsel by email at htran@wclp.org, amy@lawyersforgoodgovernment.org, and lrifkin@impactfund.org, or to other attorneys designated by these organizations.

F.    If, at any time before February 1, 2029,  the Government plans (1) to issue to  Children's Hospital of Los Angeles a new subpoena with the above-mentioned Requests 11, 12, and 13; (2) to rescind its instructions to Children's Hospital of Los Angeles to redact any patient identifying information in records that are produced in response to the Subpoena as described in the above-mentioned Paragraph 6;  and/or (3) to issue a new subpoena to any entity or person that requests documents or items related to the provision of gender related care by Children's Hospital Los Angeles that contains patient-identifying information, the Government shall, to the extent such advance notice is legally permitted, provide advance email notice to Moving Parties' counsel at least 28 calendar days prior to taking the foregoing actions. The Government will email Moving Parties' counsel at htran@wclp.org, amy@lawyersforgoodgovernment.org, and lrifkin@impactfund.org, or to other attorneys designated as their replacements by the Moving Parties. The parties acknowledge that, this provision of the Agreement notwithstanding, Rule 6(e) of the Federal Rules of Criminal Procedure prohibits the Government from "disclos[ing] a matter occurring before the grand jury" to Moving Parties or their counsel.  The parties mutually understand that HIPAA does not prohibit the advance notice contemplated in this Paragraph.

G.    Within 14 days of the date that the Agreement is fully executed, Moving Parties shall file the Notice of Dismissal attached as Exhibit C, dismissing the Action without prejudice, and attaching this executed Agreement.

H.    The Parties shall bear their own fees and costs.

I.    The Agreement, including exhibits, constitutes a single, integrated written contract and describes the entire agreement of the Parties resolving this matter.

J.      The Agreement may be executed in counterparts, including documents exchanged by electronic mail, all of which together shall constitute a single, unified document.

K.      In any claim to construe the terms of the Agreement, this Agreement shall be considered the product of negotiation by and among the parties hereto. No clause or provision shall be interpreted more strongly in favor or against one party of the other, based upon the source of the draftsmanship, but shall be interpreted in a neutral manner.

L.      Each signatory to this Agreement represents and warrants that they are fully authorized to enter into this Agreement on behalf of the persons or entities indicated below, and has done so freely and voluntarily, without any degree of duress or compulsion. This Agreement is effective when executed by all of the undersigned.

**AGREED AND ACCEPTED**

**FOR MOVING PARTIES Parent AA, Parents BB1 & BB2, Parent CC, Parent DD, Parent EE, and Legal Guardian FF:**

_____

LAWYERS FOR GOOD GOVERNMENT
Amy E. Powell, NC SBN 50300
Email: amy@lawyersforgoodgovernment.org
Khadijah M. Silver, NY SBN 5473558
Email: khadijah@lawyersforgoodgovernment.org
Alyssa F. Morrison, TX SBN 24110135
Email: amorrison@lawyersforgoodgovernment.org
1319 F St. NW Ste 301 PMB 181
Washington, DC 20004

WESTERN CENTER ON LAW & POVERTY
Helen Tran, SBN 290731
Email: htran@wclp.org
David Kane, SBN 292186
Email: dkane@wclp.org

Joy Dockter, SBN 275196
Email: jdockter@wclp.org
Robert Newman, SBN 86534
Email: rnewman@wclp.org
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010
Telephone: (213) 487-7211
Fax: (213) 487-0242

IMPACT FUND
Lori Rifkin, SBN 244081
Email: lrifkin@impactfund.org
Fawn Rajbhandari-Korr, SBN 315888
Email: fkorr@impactfund.org
Meredith Dixon, SBN 346864
Email: mdixon@impactfund.org
Megan Flynn, SBN 359394
Email: mflynn@impactfund.org
2080 Addison St., Suite 5
Berkeley, CA 94704
Telephone: (510) 845-3473 Fax: (510) 845-3654


**FOR RESPONDENT UNITED STATES OF AMERICA:**
Department of Justice
Enforcement and Affirmative Litigation Branch

LISA K. HSIAO
Acting Director

Scott B. Dahlquist (VSB 76646)
Trial Attorney
Email: scott.b.dahlquist@usdoj.gov

450 5th Street NW Suite 6400
Washington, DC 20001
Telephone: (202) 532-4602
Facsimile: (202) 514-8742

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

━━◆◆◆━━

## SUBPOENA DUCES TECUM

No. 25-1431-013

**To:**   Children's Hospital Los Angeles
4650 Sunset Boulevard
Los Angeles, California 90027

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

United States Attorney's Office, 312 North Spring Street, Los Angeles, California
on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

───────────────────────────

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

───────────────────────────

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.



BRETT SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2025.06.11
12:04:40 -04'00'

_____
*(signature)*

## RETURN OF SERVICE

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1.   **Personal delivery to an individual, to wit:**

_____
*(name)*

_____
*(title)*

_____
*(address)*

2.   **Personal delivery to an address, to wit:**

_____
*(description of premises)*

_____
*(address)*

3.   **Registered or certified mailing to:**

_____
*(name)*

_____
*(address)*

At _____ a.m. | p.m. on

_____
*(date)*

_____
*(signature)*

_____
*(title)*

# UNITED STATES OF AMERICA
# DEPARTMENT OF JUSTICE

# SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

## ATTACHMENT A TO SUBPOENA TO:

CHILDREN'S HOSPITAL LOS ANGELES
4650 SUNSET BOULEVARD
LOS ANGELES, CALIFORNIA 90027

### I.  DEFINITIONS

1.  "You," "Your Company," "the Company," and "CHLA" means:

   a.  Children's Hospital Los Angeles, a California nonprofit public benefit corporation, whose principal place of business is located at 4650 Sunset Boulevard, Los Angeles, California, without regard to any name under which it has done business;

   b.  All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including without limitation the Center for Transyouth Health and Development; and

   c.  Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.  "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.  "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a.  All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

b.     Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.     Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.     Any electronic files saved as a backup, including metadata;

e.     Any deleted but recoverable electronic files, including metadata;

f.     Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.     Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.     All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.     "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.     "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.     "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.     "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8.　"Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.　"Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10.　"Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11.　"Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12.　"Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.　You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a.　If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b.　If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

2.    **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3.    Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

    a.    Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

    b.    The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

    c.    The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.    The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.    If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.    The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.    All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8.     If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

    a.     The name and title of the author (and if different, the preparer and signatory);

    b.     The name(s) and title(s) of the individual(s) to whom the document was addressed;

    c.     The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

    d.     The date of the document;

    e.     The number of pages;

    f.     A brief description of the subject matter;

    g.     A statement of the specific basis on which privilege is claimed; and

    h.     The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.     Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.     All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.     All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

4.    All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.    All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.    Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.    All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.    All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.    All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10.    All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11.    Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12.    For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13.    All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

6

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

**IV. FORM OF PRODUCTION**

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

**1.      Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2.      Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto.  The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties.  No alteration shall be made to file names or extensions for responsive native electronic files.  If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction..  Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.   **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.   When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

*July 2022*

Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i.  All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

    ii.  All TIFF image files shall be stored with the ".tif" extension.

    iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v.  No image folder shall contain more than 2,000 images.

c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file.  The Cross Reference file should also contain the relative image file path for each Bates numbered page.  The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

*July 2022*

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment.  The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8.  The file should contain the required fields listed below in section 3.

   1. Text delimited load files are defined using the standard Concordance delimiters.  For example:

   | | |
   |---|---|
   | *Field Separator* | *¶ or Code 020* |
   | *Text Qualifier* | *þ or Code 254* |
   | *Newline* | *® or Code 174* |
   | *Multi-value* | *; or Code 059* |
   | *Nested values* | *\ or Code 092* |

   2. This load file should contain the relative file path to the individual multi-page, document level text files.
   3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
   4. There should be one line for every record in a collection.
   5. The load file must contain a header listing the metadata/database fields contained within.  For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

      þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:**  The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

\*CaseName\***Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName\***Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

3.    **Required Metadata/Database Fields**

A "✓" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13).  Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

4

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

5

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

8

*July 2022*

    i.   The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

    ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

    iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

    iv. No customization of hashing may occur without prior express approval by the Government.

    v.   De-duplication must be done by document family, not by individual document.

    vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government.  For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e.    The Producing Party  shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government.  All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields.  The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file.  If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced.  For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

*July 2022*

### 7.     Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.     Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

   a.   The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.
   b.   If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.     Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

   a.   Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
   b.   The first document in the collection represents the parent document and all other documents will represent the children.
   c.   All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
   d.   All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.     Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

10

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc.  E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

Case 2:25-cv-11183-MWC-JDE  Document 25-1  Filed 01/22/26  Page 28 of 38  Page ID #:480

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories |||||||||
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

*July 2022*

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts.  Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering.  Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements.  If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database.  Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format.  The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created.  All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

*July 2022*

    c.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
    b.   External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    c.   Government approved File Transfer Protocol (FTP) technologies.
    d.   Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    e.   Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

17

25.   **Privilege Logs**

a.       The name and title of the author (and if different, the preparer and signatory);

b.       The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.       The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.       The date of the document;

e.       The number of pages;

f.       A brief description of the subject matter;

g.       A statement of the specific basis on which privilege is claimed; and

h.       The paragraph or subparagraph of the Subpoena to which it is responsive.


26.   **Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

27.   **Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

28.   **Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

29.   **Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.


-XXX-


18

## Subject: [EXTERNAL] RE: CHLA



**Diskant, Ted** <Ediskant@mwe.com>                                     Mon, Dec 8, 2025,
to Goldstein, Ross (CRM), Runkle, Patrick, Dahlquist, Scott B (CRM)

Thanks, Ross.  Received and all noted.

**Edward B. Diskant**
Partner

**T:** +1 212 547 5754 | **M:** +1 917 273 7728 | **F:** +1 212 547 5444
ediskant@mwe.com | LinkedIn
McDermott Will & Schulte LLP | mwe.com
One Vanderbilt Avenue, New York, NY 10017



---

**From:** Goldstein, Ross (CRM) <Ross.Goldstein@usdoj.gov>
**Sent:** Monday, December 8, 2025 2:11 PM
**To:** Diskant, Ted <Ediskant@mwe.com>
**Cc:** Runkle, Patrick <Patrick.R.Runkle@usdoj.gov>; Dahlquist, Scott B (CRM) <Scott.B.Dahlquist@usdoj.gov>
**Subject:** CHLA

**[ External Email ]**
Ted,

As I mentioned on Friday during our call, I am writing regarding the HIPAA subpoena issued to CHLA on June 11, (Subpoena No. 25-1431-013).

First, based on your representations that CHLA is not the appropriate party to produce the information, the govern withdrawing requests Nos. 11, 12, and 13 (relating to patient records) in their entirety. CHLA need not produce documents or information responsive to those requests.

Second, as to all remaining requests in the subpoena—to the extent that there even is any patient identifying infor —the government will accept production with the patient's personally identifying information anonymized, with the exception that patient age or patient birth month and year should be included if present in the document. All other identifiers may be removed or replaced with a unique code, provided the underlying medical and other responsive information remains intact.

Please let me know if you have any questions or if you anticipate any issues implementing these modifications.

Regards,

Ross

---


**Ross S. Goldstein | Assistant Director**
United States Department of Justice

**WESTERN CENTER ON LAW & POVERTY**
Helen Tran, SBN 290731
Email: htran@wclp.org
David Kane, SBN 292186
Email: dkane@wclp.org
Joy Dockter, SBN 275196
Email: jdockter@wclp.org
Robert Newman, SBN 86534
Email: rnewman@wclp.org
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010
Telephone: (213) 487-7211
Fax: (213) 487-0242

(Additional counsel on following page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re 2025 Children's Hospital of Los Angeles Subpoena | Case No: 2:25-cv-11183 |
| | **NOTICE OF DISMISSAL** |

1

**NOTICE OF DISMISSAL**

**LAWYERS FOR GOOD GOVERNMENT**
Amy E. Powell, NC SBN 50300*
Email: amy@lawyersforgoodgovernment.org
Khadijah M. Silver, NY SBN 5473558*
Email: khadijah@lawyersforgoodgovernment.org
Alyssa F. Morrison, TX SBN 24110135*
Email: amorrison@lawyersforgoodgovernment.org
1319 F St. NW Ste 301
PMB 181
Washington, DC 20004

**IMPACT FUND**
Lori Rifkin, SBN 244081
Email: lrifkin@impactfund.org
Fawn Rajbhandari-Korr, SBN 315888
Email: fkorr@impactfund.org
Meredith Dixon, SBN 346864
Email: mdixon@impactfund.org
Megan Flynn, SBN 359394
Email: mflynn@impactfund.org
2080 Addison St., Suite 5
Berkeley, CA 94704
Telephone: (510) 845-3473
Fax: (510) 845-3654

*Attorneys for Moving Parties*

**Pro hac vice*

2

**NOTICE OF DISMISSAL**

## NOTICE OF DISMISSAL

Moving Parties respectfully notify the Court that the parties have reached a settlement of this matter.  *See* Exhibit 1, attached.  Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Moving Parties hereby dismiss this action without prejudice.


Dated: January 16, 2026                    Respectfully submitted,


WESTERN CENTER ON LAW & POVERTY
LAWYERS FOR GOOD GOVERNMENT
IMPACT FUND


/s/Amy Powell

_____
AMY POWELL


/s/ Joy Dockter

_____
JOY DOCKTER


*Attorneys for Moving Parties*

**NOTICE OF DISMISSAL**