# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In Re: Motion to Quash Administrative Subpoena 25-1431-032 to Rhode Island Hospital | Case No. 1:26-mc-0007-MSM-AEM |

**[PROPOSED] AMICUS BRIEF OF THE NATIONAL CENTER FOR LGBTQ RIGHTS AND THE NATIONAL CENTER FOR YOUTH LAW AS *AMICI CURIAE* IN SUPPORT OF EMERGENCY MOTION TO QUASH BY THE CHILD ADVOCATE FOR THE STATE OF RHODE ISLAND**

**INTRODUCTION**

On May 4, 2024, the Child Advocate for the State of Rhode Island brought a Motion to Quash Administrative Subpoena 25-1431-032, which the United States Department of Justice (DOJ) served on Rhode Island Hospital (RI Hospital) to command the production of information related to the hospital's provision of medical care to youth for gender dysphoria. *See* Case No. 1:26-mc-0007, Doc. 1.

Under the auspices of investigating purported health care fraud offenses, the DOJ Subpoena demands practically every document related to healthcare provided to transgender youth going back five and a half years. Staggeringly, the Subpoena demands that RI Hospital produce highly sensitive patient health records that

2

identify by name, date of birth, social security number, address, and parent/guardian information, every minor patient who received gender affirming medical care since 2020. These patient-focused requests also seek underlying documents containing the most intimate details of each youth's mental health and adolescent physical development, family history and relationships, and other highly sensitive contents of the privileged conversations they and their family had with their trusted healthcare providers.

DOJ has not and cannot justify its request for this highly sensitive information, and the Constitution protects against such unwarranted intrusion by the Government into the most intimate details of these youths' lives. *Amici* submit this brief to further highlight the constitutional privacy interests implicated for transgender youth and their families who sought care at Rhode Island Hospital and to urge this court to join the many other federal courts that have properly quashed or limited the DOJ's subpoenas.

I.    **Federal Courts Have the Authority to Quash or Limit Administrative Subpoenas and Federal Courts Around the Country Have Already Done so With Respect to Identical Subpoenas**

The Government has broad authority under 18 U.S.C. § 3468 to issue administrative subpoenas to investigate alleged health care fraud. *Doe v. U.S.*, 253 F.3d 256, 267 (6th Cir. 2001); *see also United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989). That authority, however, is not unbounded: the Government may *not*

abuse its subpoena power to unreasonably impose on a person's constitutionally protected rights or abuse the court's process. *Doe*, 253 U.S. at at 263-64; *see also Comley*, 890 F.2d at 542–44 ("[I]f a subpoena is issued for an improper purpose, such as harrassment [sic], its enforcement constitutes an abuse of the court's process."). A court is therefore "free to change the terms of an agency subpoena as it sees fit." *United States v. Exxon Corp.*, 628 F.2d 70, 77 (D.C. Cir. 1980) (citing *Flotill Prods., Inc. v. Fed. Trade Comm'n*, 278 F.2d 850, 852 (9th Cir. 1960)).

As a threshold matter, an administrative subpoena constitutes an abuse of the court's process, and is therefore unenforceable, if it is "issued for an improper purpose, such as to harass [an investigation's target] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964); *United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995) ("An agency investigatory tool might be resisted if the agency acted in 'bad faith.' Examples of agency 'bad faith' included harassment of the recipient of the subpoena, or a conscious attempt by the agency to pressure the recipient to settle a collateral dispute."); *see also United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991) (the subpoena power does not give the Government license "to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass").

In addition, to ensure that a Government subpoena does not unreasonably intrude on constitutionally protected privacy interests, courts "weigh the likely relevance of the requested material to the investigation against the burden . . . of producing the materials"—which includes the burden imposed on third party's privacy interests. *Doe*, 253 F.3d at 271 (weighing petitioner's children's heightened privacy interest in guarding their personal financial information against the likely relevance of those documents to the government's healthcare fraud investigation). In so weighing, a court does "not simply have to accept the agency's opinion as to what is and is not relevant to agency investigations"; a court has a "duty" to make its own, independent determination. *Id.* at 267.

Thus, with respect to the enforcement of an administrative subpoena, "the court's function is neither minor nor ministerial"; the court is not a "rubber stamp." *Markwood*, 48 F.3d at 978 (quoting *Oklahoma Press Publishing Co. v. Wailing*, 327 U.S. 186, 217, n.57 (1946)). And this Court's supervisory authority over the enforcement of this DOJ Subpoena is especially critical where, as here, compelled disclosure threatens core constitutional privacy interests of non-party patients who cannot practicably protect their own information.

Indeed, to date, federal district courts have now *seven times* quashed or limited DOJ subpoenas identical to the one at issue here, finding that the subpoenas make

overly invasive demands for the private health information of transgender youth and

their families and constitute an abuse of the court's process:

- The District of Massachusetts quashed the DOJ Subpoena issued to Boston Children's Hospital ("BCH"), finding that the Government "failed to show proper purpose," for its investigation. *In Re: Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025), *appeal filed,* No. 26-1093 (1st Cir. Jan. 30, 2026). The Court emphasized that the subpoena sought a sweeping scope of documents all "while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion," evincing that the subpoena was a fishing expedition, "motivated only by bad faith." *Id*.

- The Western District of Washington found that DOJ's subpoena to Seattle Children's Hospital was issued for an improper purpose in large part because of "significant evidence that the DOJ issued the subpoena to pressure hospitals into ending gender-related care for minors." *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *11 (W.D. Wash. Sept. 3, 2025). The court also observed that "DOJ's threadbare justification for its subpoena" combined with this "strong evidence" of "improper purpose" meant that "private interests must prevail in this case." *Id.* at *13.

- The Western District of Washington also quashed DOJ's subpoena to QueerDoc, PLLC, finding it was issued for an improper purpose largely due to the "breadth of the subpoena," which "demand[ed] a staggering amount of personal health data related to QueerDoc's patients, including their names, dates of birth, social security number, address, medical diagnoses, and patient intake documents." *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1304 (W.D. Wash. 2025), *appeal filed*, No. 25-7384 (9th Cir. Nov. 24, 2025). As "[t]hese requests have little to do with investigating violations of FDCA or FCA," the court concluded that "the subpoena serves to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct." *Id*.

- The Eastern District of Pennsylvania found it impossible to "discern" how "child-patients' identities and highly sensitive medical information" were "*relevant* to an inquiry into a 'federal health care offense'" with respect to DOJ's subpoena to Children's Hospital of Philadelphia. *In re Subpoena No. 25-1431-014*, F. Supp. 3d 555, 578 (E.D. Pa. 2025) (emphasis in original); *see*

6

*also id.* at 579-80 ("[T]he connection between child-patient-identifying information and potential fraudulent billing codes or unlawful off-label promotion is tenuous at best and cannot shoulder the weight of compelled disclosure of a child's medical files.").

- The Western District of Pennsylvania quashed DOJ's subpoena to UPMC, explaining that it "joins the others in finding that the government's demand for deeply private and personal patient information carries more than a whiff of ill-intent." *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025); *accord. In re: 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2026 WL 570419, at *1 (W.D. Pa. Mar. 2, 2026) (refusing DOJ suggestion to produce anonymize records because "true and effective anonymization cannot be achieved," and DOJ's assurances that it can be "trust[ed]" with such "sensitive and confidential information" are "cold comfort"); *see also id.* at *2 ("Left to its devices, the DOJ would trample states-rights to amass deeply personal information - regarding *minor children* - in service of its crusade to eliminate medical care that, until recently, was in its own eyes legal. . . . [DOJ's] rhetoric regarding gender-affirming care reflects callous indifference, if not abject cruelty. There is more than a 'whiff' of ill-intent. Arguably, it is closer to a stench.") (internal citation omitted).

- A Colorado federal magistrate judge issued a report and recommendation that a "facially overbroad" DOJ subpoena must be quashed because it "create[d] a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy," instead of "limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKCCYC, 2026 WL 33398, at *2 (D. Colo. Jan. 5, 2026)

- The District of Maryland concluded that DOJ's subpoena to Children's National Hospital was "not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth." *In re Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026). "Considering the patent disassociation of the scope of the Subpoena from purported investigation of Hospital FDCA violations," the court found, instead, that the subpoena "is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare." *Id.*

## II.    Compelled Disclosure of Youths' Medical Information Violates Their Constitutionally Protected Privacy Interests

As with these other seven cases, so too here, DOJ makes no attempt to cabin the information its Subpoena demands. Instead, the Subpoena seeks profoundly sensitive patient information with no reasonably relevant relationship to its purported interest in investigating Food, Drug, and Cosmetic Act ("FDCA") violations.

Indeed, DOJ's stated purpose of investigating healthcare fraud not only bears no relationship to the Subpoena as a whole, but also is especially disconnected to Requests 11, 12, 13, and 15 ("Patient Data Requests"). These requests demand expansive and intimate patient information entirely untethered to DOJ's stated investigation. They seek the names, dates of birth, social security numbers, addresses, and parent/guardian information for transgender youth and their families, all documents concerning their diagnoses, all documents relating to informed consent, and documentation of adverse side effects. These youth have a strong privacy interest in this information, rooted in both substantive due process doctrine and the Fourth Amendment, and this Court should take action to protect it.

### a.    The Fourth and Fifth Amendments Protect Informational Privacy Interests

In *Whalen v. Roe*, 429 U.S. 589 (1977), the U.S. Supreme Court clarified that informational privacy interests are part of the substantive due process guarantee.

There, the Court found patients' informational privacy interests were implicated by a state law requiring doctors to report to the state health department the names, addresses, physicians, pharmacies, and dosages of patients receiving certain prescription drugs. *Id.* at 591, 600. The Court distinguished between "two different kinds of interests" in privacy cases: "the individual interest in avoiding disclosure of personal matters," and "the interest in independence in making certain kinds of important decisions." *Id.* at 599-600. Informational privacy is the former. *See also id.* at 599, n.25 (collecting cases demonstrating longstanding recognition of this interest).

The Court has affirmed a person's constitutionally protected interest in informational privacy several times since *Whalen*. In *Nixon v. Adm'r of Gen. Servs.*, the Court explained that the right to privacy includes an "'individual interest in avoiding disclosure of personal matters.'" 433 U.S. 425, 457 (1977) (quoting *Whalen*, 429 U.S. at 599). Similarly, in *Nat'l Aero. & Space Admin. v. Nelson*, the Court explained that it has "referred broadly to a constitutional privacy 'interest in avoiding disclosure of personal matters.'" 562 U.S. 134, 157 (2011) (citing *Whalen*, 429 U.S. at 599, and *Nixon,* 433 U.S. at 457);[1] *see also generally* Carmel Shachar &

---

[1] The Court reaffirmed the distinction between informational and decisional privacy interests in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), and described "two very different meanings of the term ['right of personal privacy']: the right to shield information from disclosure and the right to make and implement important personal decisions without governmental interference." *Id.* at 273 (favorably citing *Whalen*, 429 U.S. at 599-600).

Carleen Zubrzycki, *Informational Privacy After* Dobbs, 75 ALA. L. REV. 1, 19 (2023) (collecting lower court cases that confirm a right to informational privacy in the context of medical records).

The Supreme Court has also grounded the right to informational privacy in the Fourth Amendment. For instance, in *Ferguson v. City of Charleston*, the Court held that state agents obtaining medical information with neither a warrant nor patient consent violated the Fourth Amendment. 532 U.S. 67, 76-77 (2001). The Court recognized a patient's reasonable expectation of privacy in their medical tests and warned that "intru[ding] on that expectation . . . may deter patients from receiving needed medical care." *Id.* at 78 & n.14 (citing *Whalen*, 429 U.S. at 599-600); *see also Nixon*, 433 U.S. at 457-59 (relying on *Whalen* but also citing Fourth Amendment cases to explain the Constitution protects informational privacy).

More recently, in *Carpenter v. United States*, the Court held that individuals retain a reasonable expectation of privacy in particularly sensitive information, such as medical records, under the Fourth Amendment, even when that information has been shared with third parties. 585 U.S. 296, 314, 317-18 (2018). Although the Court recognized that a person typically forfeits their reasonable expectation of privacy for run-of-the-mill business records held by a "third party," *see, e.g.*, *United States v. Miller*, 425 U.S. 435 (1976), the *Carpenter* Court clarified that citizens retain that privacy when particularly sensitive information is at issue. *Carpenter*, 585 U.S. at

309-10. Notably, *Carpenter* referred to medical information as an example of canonically sensitive information in which individuals retain an expectation of privacy. *See id.* at 312 (in holding that cell-site information reveals uniquely private information, noted that cell phones follow their owners "into . . . doctor's offices").

The First Circuit has likewise recognized the constitutionally protected nature of highly sensitive private health information, like that at issue here. In *Vega-Rodriguez v. Puerto Rico Tel. Co.*, the court observed that "personal privacy rights recognized by the Fourteenth Amendment [include] ensuring the confidentiality of personal matters." 110 F.3d 174, 183 (1st Cir. 1997) (citing *Whalen*, 429 U.S. at 598-600); *see also Daury v. Smith*, 842 F.2d 9, 13 (1st Cir. 1988) ("That a person has a constitutional right to privacy is now well established. Such right includes 'the individual interest in avoiding disclosure of personal matters.'") (quoting *Whalen*, 429 U.S. at 599) (other internal quotation marks and citations omitted). The court further recognized that these informational privacy interests are especially strong with respect to "profligate disclosure of medical, financial, and other intimately personal data." *Vega-Rodriguez*, 110 F.3d at 183; *see also United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (for purposes of informational privacy interests, "[m]edical information is . . . 'universally presumed to be private, not public'") (quoting *In re Bos. Herald, Inc.*, 321 F.3d 174, 190 (1st Cir. 2003)); *United States Department of Justice v. Ricco Jonas*, 24 F.4th 718, 736 (1st Cir. 2022) (explaining

11

that medical records give rise to an expectation of privacy in a way that narrower prescription drug records typically do not, since "prescription drug records do not generally or necessarily contain the more personal and intimate information that other medical records do," such as "'sensitive medical history and other information, including about mental illnesses, learning disabilities, birth defects, illicit drug use, pregnancy terminations, domestic-violence history,' patients' complaints and symptoms, and 'the patients' family members,' among others." (quoting *Eil v. U.S. D.E.A.*, 878 F.3d 392, 396 (1st Cir. 2017)).

### b.   Youth Have a Right to Privacy in the Highly Sensitive Medical Information Sought by the DOJ Subpoena

The medical records DOJ seeks in its Subpoena to RI Hospital contain precisely the kind of sensitive medical history that courts have repeatedly found to be constitutionally protected—records containing the most intimate details of each minor-patient's mental health and adolescent physical development, sexual and family history and relationships, and other highly sensitive contents of the privileged conversations they and their family had with their trusted healthcare providers. By any measure and under any test or doctrine, disclosure of this information implicates youth patients' constitutionally protected interest in informational privacy. *See In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("There can be no question that [patients] have a constitutionally reasonable expectation of privacy in the highly sensitive medical records subject to the Subpoena."); Shachar & Zubrzycki, *supra*,

12

at 28 (noting informational privacy right is particularly protective "in contexts that implicate information including medical or sexual information or that have implications for personal safety" and collecting cases).[2]  This constitutional interest is of particular importance to youth, whose perception of the confidentiality of medical care is closely connected to their willingness to seek medical care at all.  *See infra* Section III.a.

## III.  This Court Should Protect the Privacy Interests at Issue in this Case

Recognizing the heightened privacy interests at stake, several courts around the country have assessed identical or nearly identical DOJ subpoenas issued to hospitals and quashed those subpoenas in full or with respect to the specific requests

---

[2] *See also, e.g.*, *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994) ("Extension of the right to confidentiality to personal medical information recognizes there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over."); *Doe v. Se. Pa. Transp. Auth. (SEPTA)*, 72 F.3d 1133, 1137 (3d Cir. 1995) (explaining that *Whalen* held "the right to privacy encompasses . . . an interest in avoiding disclosure of personal information" and that "[m]edical records fall within" that category); *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (("The constitutional right to privacy extends to . . . 'the individual interest in avoiding disclosure of personal matters,'" including "contraception") (quoting *Whalen*, 429 U.S. at 599-600); *Payne v. Taslimi*, 998 F.3d 648, 657 (4th Cir. 2021) (following *Walls*); *Moore v. Prevo*, 379 F. App'x 425, 427 (6th Cir. 2010) ("adopt[ing]" Third Circuit's *Doe* reasoning "in full" in holding that "an inmate has a constitutional privacy right guarding against disclosure of his sensitive medical information"); *Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir. 2000) ("the right of confidentiality . . . clearly covers medical records and communications") (collecting cases); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004), *abrogated on other grounds by Dobbs*, 597 U.S. 215 ("Individuals have a constitutionally protected interest in avoiding 'disclosure of personal matters,' including medical information.") (quoting *Whalen*, 429 U.S. at 599); *A.L.A. v. W. Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) ("There is no dispute that confidential medical information is entitled to constitutional privacy protection.") (collecting cases).

13

for minor patients' identifying information and medical records. *See supra* Section I. This Court should do the same.

Some courts, including the Third and Ninth Circuit Courts of Appeals, have applied multi-factor tests to evaluate and weigh the interests at stake in enforcing an administrative subpoena. *See, e.g.*, *Westinghouse*, 638 F.2d at 578 (examining "[1] the type of record requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access, and [7] whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access"); *see Tucson Woman's Clinic*, 379 F.3d at 551 (assessing "(1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access" to determine whether disclosure is justified).

Such tests are similar to the balancing test generally used to assess subpoenas under Rule 45: when privacy interests are at stake, courts typically "weigh[] the relevance or probative value of the documents being sought against the privacy

interests asserted" in deciding whether or not to quash the subpoena.[3] *See also Doe*, 253 F.3d at 263-64 (applying the "reasonable relevance" test to weigh the Government's asserted need for the administratively-subpoenaed material against the burden and intrusion that disclosure imposes on the movant).

Under any multi-factor or balancing test, the result is clear: DOJ demands vast and undifferentiated disclosure of transgender youths' health records—records that contain the most intimate details of their young lives—imposing an extraordinary burden on their privacy, dignity, and security. Yet DOJ has shown no need for this sweeping body of sensitive health information. Nor could it, as requiring disclosure of this information bears no reasonably relevant relationship to any legitimate effort by DOJ to investigate healthcare fraud; it is certainly not "narrowly tailored" to that purpose. *See Doe*, 253 F.3d at 271 (assessing whether the subpoena's request "is sufficiently narrowly-tailored to pass the reasonable relevance standard").

This Court should also consider that the level of detail sought by this Subpoena, including and especially by the Patient Data Requests, "places the information among the most personal and sensitive a medical provider can hold and

---

[3] 8 CYC. OF FEDERAL PROC. § 26:14, *Quashal or modification of subpoena in civil proceedings, generally* (3d ed.); *see also* 28 FED. PROC., L. ED. § 65:236, *Motion to quash or modify* ("[I]n deciding whether to quash a subpoena served on a nonparty, the district court should consider dollars-and-cents costs associated with a large and demanding document production, the *privacy or confidentiality interests of the recipient and others*, and whether the subpoena seeks information beyond what the requesting party reasonably requires.") (emphasis added) (citing *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180 (4th Cir. 2019)).

squarely within the class of intimate material . . . warranting the strongest constitutional protection." *In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at \*27. Indeed, disclosure of this information would subject these youth and their families to enormous risk of harm—a factor that courts have found significant in weighing the Government's interest in obtaining such information. *See, e.g.*, *In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at \*27 (applying analogous factor to equivalent requests and concluding that "[s]uch disclosures would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma," which "would inflict deep emotional harm, destroy trust in medical care, and spread the damage to families, peers, and many others"); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998) ("[W]here the release of private information places an individual at substantial risk of serious bodily harm, . . . the 'magnitude of the liberty deprivation . . . strips the very essence of personhood.'") (quoting *Doe v. Claiborne*, 103 F.3d 495, 506-07 (6th Cir. 1996)).

### a. Disclosure of Youths' Sensitive Health Information Puts Them at Substantial Risk of Harm

Courts have recognized that disclosure of sensitive health information is of the kind that can put a person at substantial risk of harm. *See, e.g., Tucson Woman's Clinic*, 379 F.3d at 552-53 (holding "potential for harm" is "obviously tremendous" when disclosure involves sensitive medical records). In this case, this risk attaches

16

to the sensitive identifying information sought by the Patient Data Requests, even if revealed only to Government officials. As discussed briefly below, this risk is evidenced by: (1) the threat to the relationship between patients and their doctors, and (2) the stigma associated with transgender healthcare and the discrimination faced by transgender people from both this Administration and the public. *See Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 928-29 (2004) ("The natural sensitivity that people feel about the disclosure of their medical records—the sensitivity that lies behind HIPAA—is amplified when the records are of a procedure that Congress has now declared to be a crime.").

First, producing these youths' sensitive medical information would harm the doctor-patient relationship. As courts have recognized, if patients cannot trust their providers to maintain confidentiality, they will be deterred from seeking necessary care or from being candid during treatment. *See In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *29 ("Patients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns (given the present attacks on this care by the highest levels of law enforcement)."). This concern is heightened for youth patients, whose

perception of the confidentiality of medical care is closely connected to their willingness to seek medical care at all.[4]

This risk only increases with respect to stigmatized conditions or treatments, where trust between patients and providers is of paramount importance. *See, e.g.*, *Nw. Mem. Hosp.*, 362 F.3d at 929 (cautioning that hospital "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment" if it fails to "shield the medical records of its abortion patients from disclosure"); *Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*, No. C03-4872 PJH, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004) ("[T]he potential for injury to the relationship between patient and provider is significant given the providers' pledge of confidentiality.").

Second, even just revealing the personally identifying information demanded by the Patient Data Requests would subject these youth and their families to a high risk of harassment and humiliation. As the Second Circuit in *Powell* emphasized, one's transgender identity "is likely to provoke . . . hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). If youth patients'

---

[4] *See, e.g.*, American Academy of Pediatrics, *Principles for Health Information Technology to Support and Protect Adolescent Confidentiality: Policy Statement*, 157 Pediatrics e2025075747 (2026) (confidentiality of medical care fosters trust between youth and their doctor, without which youth may forgo vital medical care); Carol A. Ford et al., *Influence of Physician Confidentiality Assurances on Adolescents' Willingness to Disclose Information and Seek Future Health Care: A Randomized Controlled Trial*, 278 JAMA 1029 (1997); Jeannie S. Thrall et al., *Confidentiality and Adolescents' Use of Providers for Health Information and for Pelvic Examinations*, 154 Archives of Pediatrics & Adolescent Medicine 885 (2000).

transgender status is disclosed, they too are likely to face discrimination, harassment, and violence as a result. *See, e.g.*, *Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at *7 (S.D. Ohio, Sept. 12, 2019) ("forced disclosure of Plaintiffs' transgender status" to the relevant government agency "place[s] their 'personal safety and bodily integrity in jeopardy'") (quoting *Kallstrom*, 136 F.3d at 1064); *Love v. Johnson*, 146 F. Supp. 3d 848, 855 (E.D. Mich. 2015) (finding that because plaintiffs' transgender identities would be revealed by inaccurate identity documents, the policy at issue "poses a real threat to their 'personal security and bodily integrity'"). This harm is especially concerning when youth are involved. *See D.T. v. Christ*, 552 F. Supp. 3d 888, 897 n.8 (D. Ariz. 2021) (observing that "involuntary exposure of a child's transgender status . . . unnecessarily exposes this child to stigma, bullying, fear, and violence" and "other courts have recognized the harsh realities often facing transgender children" (collecting cases)).

Additionally, as some of these youth patients are involved with the Rhode Island Department of Children, Youth and Families (DCYF), Doc. 1 at 1, revealing personal information demanded by the subpoenas may also reveal particularly sensitive information such as information about allegations of abuse or neglect, court records, and foster placements. Indeed, recognizing the highly sensitive nature of such information, federal law requires the confidentiality of child welfare records. *See, e.g.*, Child Abuse Prevention and Treatment Act ("CAPTA"), 42 U.S.C.

5106a(b)(2)(B)(viii) (requires states who receive CAPTA grants to preserve the confidentiality of all records to protect the rights of children and their parents); 42 U.S.C. § 671(a)(8) (requires all states that receive federal funds for child welfare to have a state plan that includes safeguards restricting use of information).

Disclosure of these youths' receipt of stigmatized medical care would subject them and their families to even more serious risk of harassment and discrimination. The stigma attached to gender dysphoria and transgender healthcare in general makes the risk of harassment upon disclosure extraordinarily high. Indeed, the potential for harm upon non-consensual disclosure is high for medical records generally, but, as courts have emphasized, is even higher for medical records regarding stigmatized conditions. *See, e.g.*, *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999) (distinguishing SSN disclosure from forced "disclos[ure of] HIV status [or] sexual orientation" because "[u]nlike these personal facts, a SSN is not inherently sensitive or intimate information, and its disclosure does not lead directly to injury, embarrassment or stigma"). And the potential for harm is especially high for youth, who may forego medically-necessary care if it is not confidential. *See supra* at 16-17.

Importantly, this risk remains significant even if the identities of these youth and families are revealed only to Federal Government officials. The current administration has made clear through official pronouncements that it considers

transgender children to be the product of a "warped ideology"[5] and parents' informed consent to transgender healthcare for their children to constitute child abuse.[6] *See generally In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239 ("The Administration has been explicit about its disapproval of the transgender community and its aim to end GAC. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion."); *QueerDoc*, 2025 WL 3013568, at *5 (canvassing current administration's record of attacking transgender healthcare for transgender youth). That these pronouncements are baseless and unfounded does not lessen the risk of revealing the identities of youth and their family to these Federal Government officials.

Threats of child abuse investigations of families who have sought legal and medically-necessary care for their children inflict serious harm on youth and families. Child welfare investigations can profoundly disrupt youth and families. Even when ultimately unsubstantiated, an investigation can last for months and can cause both children and their parents psychological distress, depression, shame, and

---

[5] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, DOJ Office of Public Affairs, https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-in-volved-performing-transgender-medical (last visited May 1, 2026).
[6] *National Child Abuse Prevention Month*, 2025, WHITE HOUSE (Apr. 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025.

fear.[7] Families under investigation are more likely to avoid assistance programs, social services, and medical care.[8]

### b. Quashal is the Appropriate Remedy for DOJ's Improper and Unconstitutional Demand for Youths' Sensitive Health Information

The DOJ Subpoena's Patient Data Requests are unconstitutionally overbroad and insufficiently tethered to a proper purpose, and their enforcement would constitute an abuse of this court's process. Quashal is therefore the appropriate remedy.

DOJ has insisted elsewhere that statutory protections are in place to protect the patient information it seeks through its subpoenas. But those protections do nothing to protect these transgender youth from the harm imposed by the disclosure of their information to DOJ itself, nor do they provide sufficient assurance that the information will be safeguarded within the agency. This is particularly so in light of this Administration's expressed disdain for transgender healthcare and its willingness to identify transgender children publicly and single them and their parents out for scorn. *See In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025

---

[7] Samita Wilson et al., *Children's Experiences with Child Protection Services: A Synthesis of Qualitative Evidence*, 113 CHILDREN & YOUTH SERV. REV. 8, 8-9 (2020), https://doi.org/10.1016/j.childyouth.2020.104974; Darcey H. Merrit, *How Do Families Experience and Interact with CPS?*, 692 Annals Am. Acad. Pol. & Soc. Sci. 203, 212-13 (2020).
[8] Kelley Fong, *Concealment and Constraint: Child Protective Services Fears and Poor Mothers' Institutional Engagement*, 97 SOCIAL FORCES 1785, 1794, 1797 (2018); Charlotte Baughman et al., *The Surveillance Tentacles of the Child Welfare System*, 11 COLUM. J. RACE & L. 501, 512 (2021).

WL 3252648, at *23 ("We face a much greater privacy interest of children and their families receiving physician-recommended gender-affirming care at a time when their Attorney General describes their medical care as a warped ideology.").

First, all that 18 U.S.C. § 3486 says with respect to information received by DOJ through an administrative subpoena is that DOJ may not use or disclose information in "any administrative, civil, or criminal action or investigation directed against the individual who is the subject of that information." 18 U.S.C. § 3486(e). That limitation is extremely narrow and merely prohibits the Administration from using that information against patients. Notably, that limitation does not prohibit the Government from using that information against youths' *parents*, a group of people who the Government has, in no uncertain terms accused of child abuse, despite overwhelming evidence that what these parents are doing—supporting their transgender children—leads to positive outcomes for these youth.[9]

Moreover, DOJ has also failed to identify safeguards to prevent unwarranted dissemination of the sought information. *Cf. Tucson Woman's Clinic*, 379 F.3d at 552 (holding "the safeguards to prevent unauthorized disclosure to members of the

---

[9] The evidence shows that when transgender youth are supported, their mental health outcomes are similar to those of their peers. Catherine Shaefer et al., *Discriminatory Transgender Health Bills Have Critical Consequences for Youth*, Child Trends Research Brief, https://www.childtrends.org/publications/discriminatory-transgender-health-bills-have-critical-consequences-for-youth; Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported In Their Identities*, 137 Pediatrics 3 (Mar. 2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/pdf/PEDS_20153223.pdf

public are inadequate" where no "criminal or civil penalties" attached to disclosure of "specific, identifiable patient information," any evidence of confidentiality training was "vague," and "there are no safeguards at all against release of information to government employees who have no need for the information"). Indeed, DOJ announced its intention to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners" and the Attorney General "directed all U.S. Attorneys to investigate all suspected cases of transgender medical treatment and to prosecute all offenses to the fullest extent possible."[10] *See In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *30 (applying analogous *Westinghouse* factor to equivalent requests and concluding that DOJ "offers nothing to mitigate a concern for these children and their families given these pronouncements"). Such information sharing is particularly concerning to any parent who sought medically-approved and legal care for their transgender child that is now being falsely characterized as child abuse. *Tucson Woman's Clinic*, 379 F.3d

---

[10] *See,* MEMORANDUM FOR SELECT COMPONENT HEADS RE PREVENTING THE MUTILATION OF AMERICAN CHILDREN, OFF. ATT'Y GEN. at 3-4 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (directing all U.S. Attorneys to investigate and prosecute all suspected providers of "gender-affirming care," directing other components of DOJ to investigate FCA and FDCA claims based on same, and announcing partnership with state attorneys general to support state-level prosecution of these providers); *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, DEP'T JUSTICE OFF. PUB. AFFS. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (stating that medical professionals and organizations who provide this care "in the service of a warped ideology will be held accountable by this Department of Justice").

at 551-52 ("Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information.") (citing *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002)).

Finally, DOJ seeks to compel the disclosure of the identities of these patients as transgender people—the very people that same agency has called in official pronouncements the product of "a warped ideology," among other derogatory terms. To ask these transgender patients to trust their identities and the most intimate, sensitive details of their young lives with an administration that openly disdains them is too much to ask. The appropriate remedy for a DOJ subpoena that is improper in purpose and unreasonable in scope, that constitutes abuse of government power and the court's process, and that seeks to invade the constitutionally protected rights of a vulnerable group of children, is quashal.

## CONCLUSION

*Amici* respectfully urge this Court to grant the Emergency Motion to Quash brought by the Child Advocate for the State of Rhode Island.

Dated: May 9, 2026

Respectfully submitted,

/s/ *Amy Whelan*

Amy Whelan, *pro hac vice* pending
Shannon Minter
NATIONAL CENTER FOR
LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
Telephone:   (415) 392-6257
Facsimile:    (415) 392-8442
awhelan@nclrights.org
sminter@nclrights.org

/s/    *Nina Monfredo*
Nina Monfredo, *pro hac vice* pending
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone:     (202) 868-4781
Facsimile:     (510) 835-8099
nmonfredo@youthlaw.org

/s/ *Gil A. Bianchi, Jr.*
GIL A. BIANCHI, JR., ESQ.
Bianchi Brouillard Sousa & O'Connell, P.C.
The Hanley Building 56 Pine Street
Suite 250
Providence, RI 02903
(401) 223-2990
gbianchi@bbsolaw.com

*Attorneys for Amici Curiae*

26